[Cite as *Dearth v. Columbus*, 2019-Ohio-556.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Stephen Dearth, et al., | : | |
| Plaintiffs-Appellants, | : | |
| v. | : | No. 17AP-346<br>(C.P.C. No. 16CV-2320) |
| City of Columbus, et al., | : | (ACCELERATED CALENDAR) |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on February 14, 2019

**On brief:** *The Behal Law Group LLC, John M. Gonzales,* and *Jack D'Aurora*, for plaintiffs-appellants. **Argued:** *Jack D'Aurora.*

**On brief:** *Zachary M. Klein,* City Attorney, and *Michael R. Halloran,* for defendant-appellee City of Columbus. **Argued:** *Michael R. Halloran.*

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Plaintiffs-appellants, Stephen Dearth and Elizabeth Dearth ("the Dearths"), appeal from the decision of the Franklin County Court of Common Pleas entered on April 11, 2017, granting the motion for summary judgment filed by defendant-appellee, City of Columbus ("the City"). The Dearths challenge the trial court's conclusion that the City was entitled to a reinstatement of its political subdivision immunity under R.C. 2744.03(A)(5). For the reasons that follow, we affirm the decision of the trial court.

## I. FACTS AND PROCEDURAL BACKGROUND

{¶ 2} This action arises out of water leak in the City's water supply system that allowed water to flow onto the Dearths' yard from late evening on February 19 to the early morning of February 20, 2015, resulting in damage to the Dearths' real and personal

property. The Dearths commenced this civil action for damages against State Farm Fire and Casualty Company ("the insurer") and the City on March 7, 2016.

{¶ 3} The facts are generally undisputed. The Dearths owned and resided at a home located at 2705 Ferris Road, in an unincorporated portion of Mifflin Township in Franklin County, Ohio. The Dearths alleged that water from a broken water pipe in the City's water distribution system flowed onto their property from 7:30 p.m. on February 19, until 3:04 a.m. on February 20, 2015. The Dearths alleged damages in excess of $31,000, proximately caused by the City's "negligence, delayed response, and faulty water line." (Mar. 7, 2016 Compl. at 2.) The Dearths reached a settlement with the insurer and dismissed their complaint as to the insurer with prejudice. The Dearths maintained the action only as to the City, which timely answered.

{¶ 4} The City provides the Dearths' property with water. The City does not provide the Dearths' property with sewer service, as they have a septic system. Further, the City does not maintain, operate, or provide upkeep for the storm water sewer on the Dearths' property because it is not part of a utility maintained by the City.

{¶ 5} At approximately 7:30 p.m. on February 19, 2015, a water line beneath Ferris Road in front of the Dearths' residence ruptured, causing a leak ("Ferris leak"). The City acknowledges it received a report of the Ferris leak by 8:44 p.m. on February 19 but did not turn off the water at the affected area until 3:04 a.m. on February 20, approximately seven and one-half hours after the initial rupture.

{¶ 6} The City experienced unusually cold weather on February 19, 2015. The Ferris leak was one of three after-hours water leaks reported to the City on that date.

{¶ 7} Normal business hours of the City's Department of Public Utilities ("DPU") are 7:00 a.m. to 3:30 p.m. The City relies on a voluntary response procedure for responding to water leaks reported after-hours, when DPU is unstaffed except for a dispatcher. The trial court detailed the procedure in its decision granting the City's motion for summary judgment:

> The City relies on a voluntary response for after-hour water leaks. Normal business hours for the Department of Public Utilities ("DPU") are 7:00 a.m. to 3:30 p.m. DPU has a water maintenance dispatcher working twenty-four hours a day, seven days a week. Water-related problems, such as a leak or break, reported to the City are received by the dispatcher. If a

report needs [to be] investigated, the dispatcher notifies a Supervisor II. A Supervisor II will respond and determine whether or not the problem requires an immediate repair. No DPU personnel are on-call after 3:30 p.m. on weekdays or at any time on the weekends. After-hours responses to leaks rely on volunteers. If no Supervisor II volunteers, the dispatcher may also call an available Supervisor I or water distribution maintenance workers trained to investigate problems. If a Supervisor II determines the problem requires an immediate repair, the dispatcher will begin to assemble a crew. The crew typically consists of one Supervisor I, two excavators, and two or three maintenance workers. The number and type of personnel responding depends upon the repair work.

(Citations to affidavits of DPU employees omitted.) (Apr. 7, 2017 Entry at 2.) The trial court noted further, "DPU has determined there is not a need for mandatory on-call time since qualified employees respond after-hours. It is unusual to have more than one emergency repair on the same night, during the same timeframe." *Id.*

{¶ 8} Dispatcher Matt Burt began working at 3:00 p.m. on February 19, 2015. He was the only DPU water maintenance dispatcher working at that time. At approximately 5:24 p.m. on February 19, Burt received a call that water was leaking into the basement of an Ohio State University ("OSU") building near the intersection of Summit Street and East Seventh Avenue in Columbus, Ohio ("Summit leak"). He was informed water was leaking into an area of the building where computer and technology equipment was located. Burt also received reports residents in the area were without water.

{¶ 9} DPU Supervisor II Brian Craft responded to investigate the Summit leak, where he found an active leak causing property damage to the OSU building. Craft determined, because of the type of property involved, the potential for additional damage, and several people in the area without water, repairing the Summit leak was a priority. At approximately 8:04 p.m., Craft requested an emergency repair crew. At approximately 8:11 p.m., Burt began to call water division employees in a designated order. By 9:35 p.m., Burt had completed the calls and was waiting for crew members to respond to the Summit leak.

{¶ 10} During this time, DPU received reports of additional water leaks. At 8:08 and 8:23 p.m., Burt received calls about a water leak near the intersection of Westover Road and Southway Drive in Upper Arlington ("Southway leak"). At 8:44 p.m., Burt received a

call reporting the Ferris leak. Burt placed four calls between 8:32 and 8:51 p.m. in an attempt to get another Supervisor II to respond to and investigate the Southway and Ferris leaks. Burt received a call at 9:59 p.m. that water was entering the Dearths' basement. Burt was unable to get a Supervisor II to volunteer to respond to either the Southway or Ferris leaks.

{¶ 11} Burt attested that, when multiple leaks are reported, they are investigated in the order received unless the leak involves a critical customer, such as an airport or hospital. Burt determined the Summit leak was the priority because of the potential damage to a computer and technology system took priority over the report of water leaking into a basement. The emergency crew reported to the Summit leak site between 10:20 and 10:45 p.m.

{¶ 12} Burt received additional calls about the Ferris leak from Mifflin Township police officers. Burt attested that he thought, at some point after the emergency crew arrived at the Summit leak site, Craft would be able to leave that location to investigate the Ferris leak. However, Craft notified Burt he could not leave the Summit leak to investigate another leak due to the extent of the work and the labor intensive requirements to complete the repairs.

{¶ 13} Burt then attempted again to call another Supervisor II to respond to the Ferris leak. At 1:18 a.m. on February 20, 2015, Burt reached Supervisor II/Foreman II Sam Short, who volunteered to respond to the Ferris site. Short arrived at the Ferris leak soon after 2:00 a.m., noting upon his arrival that the temperature was below zero degrees Fahrenheit. Short assessed the situation and, at 2:09 a.m., called Burt to "get an emergency spot for utility line locations and to assemble an emergency crew to repair the leak." (Short Aff. at ¶ 16, attached to Dec. 12, 2016 Mot. for Summ. Jgmt.) Burt began calling for additional volunteers. Short called Craft for assistance in shutting off the water supply to the Ferris site. By then, Craft was able to leave the Summit leak to assist Short.

{¶ 14} Short used a database on his City laptop to determine which valves had to be shut off to stop the water flow of the Ferris leak. He then had to find the physical location of the valves. At 2:34 a.m., Short notified Burt he was beginning the process of shutting off a 12-inch water main to stop the leak. After Craft arrived, he and Short shut off an upstream

and downstream valve, isolating the Ferris leak and stopping the water flow. Short notified Burt the shutdown of the Ferris leak was complete. The water was shut off at 3:04 a.m.

{¶ 15} The City maintains it could not muster enough volunteers to assemble an emergency crew to repair the Ferris leak. Consequently, repairs took place during normal hours, beginning at 8:00 a.m. February 20, 2015. Rob Foster, the supervisor of the DPU repair crew, determined there was damage to the valve of a 6-inch pipe that supplied water from a 12-inch main to a fire hydrant on Ferris Road. Foster observed that the asphalt on Ferris Road had been peeled back and much of the dirt and gravel around the pipe had been removed from the area. Foster also observed some debris, including dirt and gravel, as well as water and ice, in the Dearths' front yard. Foster did not see a storm sewer drain in the Dearths' front yard. Foster attested that the DPU crew, after completing repairs, cleaned as much of the dirt and gravel off the Dearths' driveway as they were able to, given the weather conditions. Due to the weather conditions, it was not possible for the City to restore the Dearths' yard at that time.

{¶ 16} Timothy Huffman, the City's Water Distribution Engineering Manager, attested that the 12-inch water main in front of the Dearths' property had been replaced in 2000 by a third-party contractor, who also had installed a valve connecting the water main to a fire hydrant. The City required compliance with and followed standards for water main installation established by the American Water Works Association ("AWWA") in order to minimize the potential for leaks and breaks in a water distribution system. Water mains and hydrant leads are required to be made of ductile iron pipe, which has a life expectancy of 100 years. The City required the contractor who installed the water main and valve in front of the Dearths' property to comply with the AWWA standards. Huffman attested that, despite these standards, no precaution will entirely prevent a leak or break.

{¶ 17} The Dearths alleged in their complaint that they suffered economic damages as a direct and proximate result of the City's negligence, delayed response to the Ferris leak, and faulty water line. The Dearths subsequently specified that the City had failed to clear a culvert or storm drain of debris in the Dearths' front yard.

{¶ 18} On December 12, 2016, following discovery that included deposing the Dearths, the City filed a motion for summary judgment, asserting statutory immunity under the Political Subdivision Tort Liability Act, R.C. Chapter 2744. The City argued the

Dearths could not establish an exception to the general grant of political subdivision immunity provided for in R.C. 2744.02(A). Alternatively, the City argued that, if an exception listed under R.C. 2744.02(B) abrogated immunity, the provisions of R.C. 2744.03(A)(5) provided a full defense to liability and reinstated immunity "because the City exercised judgment and discretion when it allocated its resources to the Summit leak and when it determined which standards would apply to the construction of the Ferris Road water main." (Mot. for Summ. Jgmt. at 13.) The City attached to its motion the transcripts of the Dearths' depositions and the affidavits of DPU employees[1] who had been personally involved in addressing the Ferris leak or who had knowledge of DPU's practices and procedures.

{¶ 19} The Dearths, by memorandum contra filed January 6, 2017, opposed the City's motion, asserting they were not suing the City for failing to maintain the water lines, properly repair the rupture, or maintain the sewer or culvert in the Dearths' front yard. Rather, they were suing the City for the negligence of its employees (1) in failing to shut off the water in a timely manner and (2) in clogging, and then failing to unclog, the culvert near the leak repair, which affected and prevented water drainage from their yard. They argued that a question of fact existed as to the reasonableness of the City's response to the Ferris leak. They also argued that the City's negligent acts related to the proprietary function of operation of a water supply system, such that political subdivision immunity did not shield the City from immunity. On January 9, 2015, the Dearths filed with the trial court the affidavit of Jose Cantu, whom they had retained to review the information provided by the City and to evaluate the City's response to the Ferris leak. Cantu opined that it took the City an unreasonable amount of time to shut off the water to the area of the Ferris leak.

{¶ 20} The trial court, by decision and entry filed April 7, 2017, granted the City's motion for summary judgment, finding the City was entitled to immunity under the Ohio Political Subdivision Tort Liability Act, R.C. Chapter 2744. Although the trial court found that genuine issues of fact existed as to whether or not the City was negligent in its response to the Ferris leak, it determined the City's liability was precluded based on the

---

[1] The City filed with its motion for summary judgment the affidavits of Division of Water Dispatcher Matt Burt, Supervisor II/Foreman II Brian Craft, Water Distribution Engineering Manager Timothy Huffman, Supervisor II/Foreman II Sam Short, Supervisor I/Foreman I Rob Foster, Water Maintenance Assistant Coordinator Patrick Crumley, and Mike Foster, whose duties on behalf of the City included regulatory compliance, engineering staff liaison, floodwall coordinator and management of staff.

reinstatement of immunity pursuant to R.C. 2744.03(A)(5), because the City's employees had exercised judgment and discretion when determining how to prioritize and allocate resources in response to the multiple, after-hours reports of water main breaks. The trial court explained its decision as follows:

> Here, while at the Summit leak site, Craft determined the Summit leak was the priority leak and told Burt he could not leave to investigate other leaks due to the manpower requirements and potential for additional property damage. (Craft Aff., ¶¶ 8-15.) As a result, based on Burt's telephone conversation with Craft, Burt determined that the Summit leak site was the priority and Burt focused his efforts assembling a crew to respond to the Summit leak. (Burt Aff. ¶¶ 49-53.) Accordingly, because the Court finds the City's decision to allocate resources comports with R.C. 2744.03(A)(5), in that it was made with judgment and discretion, as a matter of law Plaintiffs cannot prevail. The City, as a political subdivision, is immune under R.C. 2744.

(Apr. 7, 2017 Entry at 12.)

{¶ 21} The Dearths timely appealed the trial court's decision and judgment entry.

## II. ASSIGNMENT OF ERROR

{¶ 22} The Dearths present for our review a single assignment of error:

> The trial court erred in concluding that the city of Columbus is immune from liability under R.C. 2744.03(A)(5).

The Dearths submit that the issue is whether the decision of the City's employees not to investigate the Ferris Road water line break and resulting leak for approximately eight hours involved either planning or policy-making or a high degree of official judgment or discretion. The Dearths submit that it did not, and, consequently, the City is not immune from liability under R.C. 2744.03(A)(5) for the damages the Dearths incurred.

## III.  LAW AND DISCUSSION

### A.  Standard of Review

{¶ 23} The trial court resolved the Dearths' complaint by summary judgment after orders were entered concerning discovery between the parties.

> Appellate review of summary judgment motions is de novo. *Helton v. Scioto Cty. Bd. of Commrs.* (1997), 123 Ohio App. 3d 158, 162, 703 N.E.2d 841. When reviewing a trial court's decision granting summary judgment, we conduct an

> independent review of the record, and the appellate court "stands in the shoes of the trial court." *Mergenthal v. Star Banc Corp.* (1997), 122 Ohio App. 3d 100, 103, 701 N.E.2d 383.

*Rose v. Ohio Dept. of Rehab. & Corr.*, 173 Ohio App.3d 767, 2007-Ohio-6184, ¶ 18 (10th Dist.).

{¶ 24} Accordingly, when reviewing an appeal of an order granting a motion for summary judgment, this Court uses the same standard of review as the trial court. *Freeman v. Brooks*, 154 Ohio App.3d 371, 2003-Ohio-4814, ¶ 6 (10th Dist.), citing *Maust v. Bank One of Columbus, N.A.*, 83 Ohio App.3d 103, 107 (10th Dist.1992), *jurisdictional motion overruled*, 66 Ohio St.3d 1488 (1993). An appellate court's review of a summary judgment disposition, however, is independent and without deference to the trial court's determination. *Brown v. Scioto Cty. Bd. of Commrs.*, 87 Ohio App.3d 704, 711 (4th Dist. 1993). Therefore, in determining whether a trial court properly granted a summary judgment motion, an appellate court must review the evidence according to the standard set forth in Civ.R. 56, as well as according to applicable case law. *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356 (1992); *Cooper v. Red Roof Inns, Inc.*, 10th Dist. No. 00AP-876 (Mar. 30, 2001).

{¶ 25} Civ.R. 56(C) requires that:

> Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Civ.R. 56 has been described as a means to facilitate the early assessment of the merits of claims, to foster pre-trial dismissal of meritless claims, and to define and narrow issues for trial. *Telecom Acquisition Corp. I v. Lucic Ents.*, 8th Dist. No. 102119, 2016-Ohio-1466, ¶ 92. *See also Kulch v. Structural Fibers, Inc.*, 78 Ohio St.3d 134, 170 (1997) (Cook, J., concurring in part and dissenting in part). As such, summary judgment is a procedural device designed to promote judicial economy and to avoid needless trials.

> "The goal of a motion for summary judgment is to narrow the issues in a case to determine which, if any, should go to trial. ' "The purpose of summary judgment is not to try issues of fact, but is, rather, to determine whether triable issues of fact exist." '

> *State ex rel. Anderson v. The Village of Obetz*, 10th Dist. No.
> 06AP-1030, 2008-Ohio-4064, ¶ 64, quoting *Lakota Local
> School Dist. Bd. of Edn. v. Brickner*, 108 Ohio App.3d 637, 643,
> 671 N.E.2d 578 (1996) (citations omitted.)"

*Erickson v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 16AP-74, 2017-Ohio-1572, ¶ 19, quoting *Thevenin v. White Castle Mgt. Co.*, 10th Dist. No. 15AP-204, 2016-Ohio-1235, ¶ 45 (Brunner, J., concurring). A party seeking summary judgment on the grounds that a nonmoving party cannot prove its case bears the initial burden of informing the trial court of the basis for the motion and must identify those parts of the record which demonstrate the absence of a genuine issue of material fact on the elements of the nonmoving party's claims. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-93 (1996).

{¶ 26} If the moving party has satisfied its initial burden, the burden shifts to the nonmoving party to set forth specific facts showing there is a genuine issue for trial. If the nonmoving party does not respond, summary judgment, if otherwise appropriate, shall be entered against the nonmoving party. *Id.* The nonmoving party may not rest on the mere allegations or denials of his or her pleadings, but must respond with specific facts showing there is a genuine issue for trial. Civ.R. 56(E); *Dresher* at 293.

### B. Discussion

{¶ 27} The trial court granted the City's motion for summary judgment based on its conclusion that the City was entitled to political subdivision immunity pursuant to R.C. 2744.03(A)(5). In their assignment of error, the Dearths contend the trial court's conclusion was in error because the decisions made by the City's employees did not constitute an "exercise of judgment or discretion" contemplated by R.C. 2744.03(A)(5).

{¶ 28} The Political Subdivision Tort Liability Act, R.C. Chapter 2744, provides that political subdivisions are generally immune from damages in a civil tort action. *Vacha v. Ridgeville*, 136 Ohio St.3d 24, 28 (2013). "Whether a political subdivision is immune from civil liability is purely a question of law, properly determined prior to trial and preferably on a motion for summary judgment." *Yonkings v. Piwinski*, 10th Dist. No. 11AP-07, 2011-Ohio-6232, ¶ 18, citing *Conley v. Shearer*, 64 Ohio St.3d 284, 292 (1992), citing *Roe v. Hamilton Cty. Dept. of Human Servs.*, 53 Ohio App.3d 120, 126 (1st Dist.1988).

{¶ 29} A court must engage in a three-tiered analysis to determine whether a political subdivision is entitled to immunity pursuant to R.C. Chapter 2744. *Yonkings* at

¶ 18, citing *Hubbard v. Canton Cty. School Bd. of Edn.*, 97 Ohio St.3d 451, 2002-Ohio-6718, ¶ 10, citing *Cater v. Cleveland*, 83 Ohio St.3d 24, 28 (1998). The first tier requires the court to determine whether the entity claiming immunity is a political subdivision and whether the alleged harm occurred in connection with either a governmental or proprietary function. R.C. 2744.02(A)(1); *Yonkings* at ¶ 18, citing *Hubbard* at ¶ 10. Once it is determined that an entity is entitled to immunity under the first tier, the court then proceeds to the second tier of the analysis, which requires the court to determine whether any of the five exceptions to immunity enumerated in R.C. 2744.02(B) apply to expose the political subdivision to liability. *Id.* If the court finds applicable any of the R.C. 2744.02(B) exceptions, the political subdivision can reinstate immunity under the third tier by successfully arguing that one of the defenses to liability set forth in R.C. 2744.03(A) applies. *Elston v. Howland Local Schools*, 113 Ohio St.3d 314, 2007-Ohio-2070, ¶ 12.

### 1. First Tier of Political Subdivision Immunity Test

{¶ 30} The general rule of immunity is set forth in R.C. 2744.02(A)(1), as follows:

> For the purposes of this chapter, the functions of political subdivisions are hereby classified as governmental functions and proprietary functions. Except as provided in division (B) of this section, a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function.

{¶ 31} The parties do not dispute that the City is a political subdivision as defined by R.C. 2744.01(F) or that the alleged damages occurred in connection with a proprietary function as provided for in R.C. 2744.01(G)(2)(c). Accordingly, the first tier of the immunity test is satisfied, and the City is presumed to be immune from liability unless one of the exceptions set forth in R.C. 2744.02(B) applies.

### 2. Second Tier of Political Subdivision Immunity Test

{¶ 32} The City may be liable as a political subdivision if the Dearths' claims fall within any of the exceptions in R.C. 2744.02(B). The exceptions contained in R.C. 2744.02(B) are "in derogation of a general grant of immunity [and] they must be construed narrowly if the balances which have been struck by the state's policy choices are to be maintained." *Doe v. Dayton City School Dist. Bd. of Edn.*, 137 Ohio App.3d 166, 169 (2d Dist.1999).

{¶ 33} Of the five exceptions contained in R.C. 2744.02(B), the Dearths assert that the exception to immunity set forth in subsection (2) applies to establish the City's liability. Section (B) provides in pertinent part as follows:

> (B) Subject to sections 2744.03 and 2744.05 of the Revised Code, a political subdivision is liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by an act or omission of the political subdivision or of any of its employees in connection with a governmental or proprietary function, as follows:
>
> * * *
>
> (2) Except as otherwise provided in sections 3314.07 and 3746.24 of the Revised Code, political subdivisions are liable for injury, death, or loss to person or property caused by the negligent performance of acts by their employees with respect to proprietary functions of the political subdivisions.

R.C. 2744.02(B)(2).

{¶ 34} The Dearths alleged in their complaint that R.C. 2744.02(B)(2) applied because the damage to their "yard, porch, driveway, and garage" was "a direct and proximate result of [the City's] negligence, delayed response, and faulty water line." (Compl. at 2.) The Dearths subsequently refined their allegation to indicate that their damages were caused by three acts of negligence on the part of the City's: (1) the City's response to the Ferris leak; (2) the water line was faulty; and (3) the City's failure to clear debris from a storm sewer drain at the front of the Dearths' property.

{¶ 35} In contrast, the City maintained that no exception applied to remove the general grant of immunity:

> [The Dearths] still must prove the elements of negligence, duty, breach, proximate cause, and damages. *Inland Prods. v. City of Columbus*, 193 Ohio App.3d 740, 2001-Ohio-2046, 954 N.E.2d 141, ¶ 39. But here, no exception applies to remove general immunity. First, the response to the Ferris leak was not negligent. Second, the faulty water line claim concerns a governmental function. And third, the City does not have a duty to clear debris from the culvert and storm drain on [the Dearths'] property since neither are part of a City operated utility.

(Mot. for Summ. Jgmt. at 9.)  The City asserted that its response to the Ferris leak was not negligent for two reasons.  First, it contended that neither simultaneous breaks requiring a response, nor the risk of harm due to simultaneous emergency repairs, was foreseeable. The City argued that it was "not required to anticipate and guard against every conceivable injury," and thus had no duty to respond simultaneously to multiple emergency repairs.  *Id.* at 10.  Accordingly, it had not breached any duty owed to the Dearths. The City further asserted that, even if simultaneous emergency repairs were foreseeable, its response was reasonable in light of the circumstances, and again, did not constitute a breach of any duty owed to the Dearths.

{¶ 36}  Based on our de novo review of the record and the decision of the trial court, we agree with the trial court that "issues of fact exist as to whether the City had a duty and whether the City breached that duty."  (Apr. 7, 2017 Entry at 8.)  We adopt the trial court's findings and analysis relating to the second tier of the political subdivision immunity test and incorporate them in our decision:

> Actionable negligence requires the showing of a duty, the breach of that duty and an injury proximately resulting therefrom. *Jeffers v. Olexo*, 43 Ohio St.3d 140, 142, 539 N.E.2d 614, 616 (1989). "The existence of duty may be established by common law, statute, or by the particular facts and circumstances of a case." *Schmitz v. NCAA*, 2016-Ohio-8041, 67 N.E.3d 852 ¶ 48 (8th Dist.) citing *Chambers v. St. Mary's School*, 82 Ohio St.3d 563, 565, 1998 Ohio 184, 697 N.E.2d 198 (1998). The existence of a duty depends on the forseeability [sic] of harm. *Reitz v. May Co. Dept. Stores*, 66 Ohio App.3d 188, 191, 583 N.E.2d 1071 (8th Dist. 1990), citing *Jeffers, Id.* at 142-43; *Menifee v. Ohio Welding Products, Inc.,* 15 Ohio St.3d 75, 472 N.E. 2d 707 (1984).
>
> Whether the City had a duty with respect to providing multiple crews turns upon whether it was reasonably foreseeable that multiple pipes would break on February 19, 2015.  The City argues that the need for multiple crews to respond to simultaneous emergency repairs was not foreseeable because multiple leaks are unusual.  However, the Court notes that it is possible that a particular set of circumstances may be both unusual and foreseeable.  The test for foreseeability is not whether the surrounding circumstances are unique, rather the test is "whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act." *Estates of Morgan*

> *v. Fairfield Family Counseling Ctr.,* 77 Ohio St.3d 284, 293, 1997-Ohio-194, 673 N.E.2d 1311.  The Court finds that in order to determine whether a reasonably prudent person would have anticipated multiple pipes breaking requires factual determination by the trier of fact and therefore genuine issues of fact exist.
>
> As to the City's second argument, concerning breach, the Court finds that fact issues exist.  The City presents the affidavit of Matt Burt, wherein he avers that in responding to the simultaneous leaks, he and Brian Craft determined that the Summit leak was the priority response because several residents in the area were without water and water was encroaching upon and damaging a computer system at an OSU building.  (Burt Aff., ¶¶ 13, 38, 48 – 53, Craft Aff. ¶¶ 6 – 15.)  Further, Burt avers that he attempted, unsuccessfully, to call additional employees to respond to the Ferris leak within minutes after receiving notice of the leak.  (Burt Aff., ¶¶ 39 – 44.)
>
> In response, [the Dearths] present the affidavit of their expert, Jose Cantu. Cantu avers that "it was unreasonable to take six hours to shut off water to the area of the water leak."  (Affidavit of Jose Cantu, ¶ 7.)  Cantu opines that "almost any City water department worker can shut off the valves;" that "private contractors can also shut valves;", and that "any member of [the Summit leak crew] could have temporarily diverted to the Ferris Road leak."  (*Id.* ¶¶ 12 – 16.)  The Court finds that Jose Cantu's affidavit creates a fact issue for the [trier] of fact.

(Apr. 7, 2017 Entry at 8-9.)  Accordingly, the City's argument for immunity is not at this point determinative of this action, and it could be held liable for damages unless immunity is restored under one of the exceptions set forth in R.C. 2744.03(A).

### 3.  Third Tier of Political Subdivision Immunity Test

{¶ 37}  Having found the exception under R.C. 2744.02(B)(2) could defeat the City's immunity, we now consider whether the City can reinstate immunity under the third tier of the analysis by successfully arguing that one of the defenses to liability set forth in R.C. 2744.03(A) applies.  *Elston* at ¶ 12.  If an exception contained in R.C. 2744.02(B)(2) applies, then "under the third tier of the analysis, immunity may be 'revived' if the political subdivision can demonstrate the applicability of one of the defenses found in R.C. 2744.03(A)(1) though (5)."  *Hopkins v. Columbus Bd. of Edn.,* 10th Dist. No. 07AP-700,

2008-Ohio-1515, ¶ 12, quoting *Aratari v. Leetonia Exempt Village School Dist.*, 7th Dist. No. 06 CO 11, 2007-Ohio-1567, ¶ 16.

{¶ 38} The City argues that, assuming its liability is established under R.C. 2744.02(B)(2), its immunity from liability is reinstated under R.C. 2744.03(A)(5), which provides as follows:

> The political subdivision is immune from liability if the injury, death, or loss to person or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner.

{¶ 39} Under R.C. 2744.03(A)(5), "a political subdivision is immune from liability if the injury complained of resulted from an individual employee's exercise of judgment or discretion in determining how to use equipment or facilities unless that judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner." *Elston* at ¶ 3.

{¶ 40} The Dearths do not contend the City's employees acted with malice or bad faith or in a wanton reckless manner.  Rather, they argue that the employees' actions did not constitute an "exercise of judgment or discretion" as contemplated by R.C. 2744.03(A)(5).  The Dearths characterized the decisions made by the City's employees as "routine," rather than "the broad type of discretion involving public policy made with the creative exercise of political judgment."  (Jan. 6, 2017 Memo. Contra at 4.)  The Dearths similarly argue that the supervisor's allocation of personnel in the field is not a policy judgment, but "a routine act that requires very little discretion and weighing of alternatives."  *Id.* at 5.  The Dearths argue that the decision of the City's employees not to investigate the Ferris Road water line break for many hours after it had been reported constituted negligence.  They assert their property damage resulted from Craft's decision not to leave the Summit leak site to remedy the Ferris leak.  They contend Craft's decision did not involve either planning and policy-making or a high degree of official judgment of discretion and, therefore, the City does not qualify for reinstatement of immunity under R.C. 2744.03(A)(5).

{¶ 41} In opposing summary judgment and in prosecuting this appeal, the Dearths rely on *Matter v. Athens*, 4th Dist. No. 13CA20, 2014-Ohio-4451, which also concerned a municipal corporation's claim of immunity in connection with its response to a leak in the municipal water supply system. In *Matter*, the Fourth District Court of Appeals reversed and remanded the trial court's decision that the city was entitled to immunity. The appellate court found that, although the city was partially entitled to summary judgment on the claim that its decisions pertaining to the after-hour staffing level of the water department were discretionary, there existed a genuine issue of material fact as to whether the defense under R.C. 2744.03(A)(5) applied to the city's repair crew merely shutting off water valves. The Fourth District concluded that, because "it [did] not appear that the crew responding to the water line break * * * considered or weighed the different options available to them in trying to stop the flow." *Matter* at ¶ 47. The Fourth District also found no evidence in the record indicating the repair crew had engaged in any sort of decision-making process or had weighed alternatives with respect to their failure to use the water shut-off valves. *Id.* Accordingly, the appellate court held that the city was not entitled to reinstatement of immunity under R.C. 2744.03(A)(5).

{¶ 42} The City responds that, assuming arguendo that there was a genuine issue regarding its negligence, its immunity is reinstated because its employees did exercise judgment and discretion when determining how to allocate personnel and resources in response to multiple, after-hour reports of water main breaks. The City argues that Dearths' claims are based on the supposition that Burt and Craft's determination as to the allocation of DPU's personnel and equipment on February 19 was neither a public policy decision nor of a sufficiently high level of judgment or discretion to satisfy R.C. 2744.03(A)(5). The City submits that, to the contrary, the affidavits of Burt and Craft demonstrate they adopted a course of conduct that focused on allocating existing resources to simultaneous after-hour water leaks in challenging weather conditions. Craft determined the circumstances at the Summit leak prevented him from going to the Ferris leak. Burt unsuccessfully attempted to locate another supervisor to respond to the Ferris leak. Burt then focused efforts on the Summit leak as the priority repair site.

{¶ 43} The City submits the record of the case before us evidences that they satisfied the requirements of R.C. 2744.03(A)(5). The City's employees designated the Summit leak

as DPU's priority, based on the information Burt received as the dispatcher and the assessment Craft made at the Summit leak site. With no volunteers available to respond to either the Southway or Ferris leaks, Burt thought Craft would go from the Summit leak to the Ferris leak once an emergency crew arrived at the Summit leak.  The City asserts that Craft's determination that the extent of the work and the manpower required at the Summit leak prevented him from responding to the Ferris leak "displayed a positive exercise of judgment that portrays a considered adoption of a particular course of conduct in relation to the City's response to multiple reports or broken water mains."  (June 22, 2017 City's Brief at 14.)  Further, after Craft made that determination, Burt began a second attempt to locate a supervisor to respond to the Ferris leak.  The City contends that "[b]ased upon these facts, Burt and Craft exercised judgment or discretion in determining how to use the City's personnel and other resources in handling multiple report of broken water mains within the same time frame." *Id.* at 14-15.  The City concludes that, because the Dearths do not allege that Burt or Craft acted " 'with malicious purpose, in bad faith, or in a wanton or reckless manner,' " it is entitled to reinstatement of immunity under R.C. 2744.03(A)(5).  (City's Brief at 15, quoting R.C. 2744.03(A)(5).)

{¶ 44}  The City asserts that the Dearths, in contending that the City does not qualify for reinstatement of immunity under R.C. 2744.03(A)(5) because the decisions made by its employees did not involve either planning and policy-making or a high degree of official judgment of discretion, are conflating the defenses under   R.C. 2744.03(A)(3) and 2744.03(A)(5).  The City notes the Dearths rely on *Enghauser Mfg. Co. v. Eriksson Eng., Ltd.*, 6 Ohio St.3d 31, 35 (1983), and a line of subsequent cases that cite some aspect of *Enghauser*, to support their proposition that " '[t]he appropriate dividing line falls between those functions which rest on the exercise of judgment and discretion and represent planning and policy-making and those functions which involve the implementation and execution of such governmental policy or planning.' "  (Emphasis omitted.) (June 8, 2017 Dearths' Brief at 8-9, quoting *Enghauser* at 55.) (City's Brief at 15-16.)  The City submits that the Dearths' reliance on *Enghauser* to explain when the defense under R.C. 2744.03(A)(5) confers immunity for the exercise of judgment or discretion is misplaced:

> In *Enghauser*, the Supreme Court abolished the judicially created doctrine of municipal immunity.  *Enghauser*, 6 Ohio St.3d 31 at paragraph one of the syllabus. While doing so, the Supreme Court retained the doctrine of municipal immunity

for tort actions "involving the exercise of a legislative or judicial function or the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion" *Id.* at paragraph two of the syllabus. The decision in *Enghauser* predates the enactment of R.C. Chapter 2744 by the General Assembly. So while *Enghauser* may provide historical insight into the defenses under R.C. 2744.03—particularly the defenses under R.C. 2744.03(A)(1) through (3)—the decision does not interpret or apply the defenses.

(City's Brief at 16-17)

{¶ 45} The City contrasts the *Enghauser* decision from the decision in a 2007 case, *Elston*, in which the Supreme Court of Ohio distinguished the defenses in R.C. 2744.03(A)(3) and 2744.03(A)(5) in connection with actions taken by a high school baseball coach:

In *Elston*, the Supreme [Court] held the defense under R.C. 2744.03(A)(5) applied to the judgment or discretion exercised by a high school baseball coach. *Id.* at ¶ 26. The Supreme Court then addressed the defense under R.C. 2744.03(A)(3) and held it did not apply to the baseball coach's discretionary acts because there was no evidence the coach's position involved policy-making, planning, or involved the exercise of a high degree of official judgment or discretion. *Id.* at ¶ 30. In so doing, the Supreme Court determined the application of the defense in R.C. 2744.03(A)(5) does not hinge upon planning, policy-making, or a high degree of official judgment or discretion. * * *

Specifically, the Supreme Court found the defense under R.C. 2744.03(A)(5) reinstated the school's immunity because instruction provided to pitchers regarding the use of the L-screen and general guidance regarding game-day preparations by a high school baseball coach represented the exercise of judgment and discretion in the use of equipment or facilities in connection with the employee's position as a baseball coach. *Id.* at ¶¶ 21, 26.

The Supreme Court then distinguished the defense under R.C. 2744.03(A)(5) from the defense under R.C. 2744.03(A)(3). "Although both R.C. 2744.03(A)(5) and 2744.03(A)(3) concern an employee's discretionary acts, the focus of subsection (A)(3) is that the employee be engaged in policy-making, planning, or enforcement." *Id.* at ¶ 27. "[A] political subdivision may assert

the immunity defense when an employee who has the duty and responsibility for policy-making, planning, or enforcement by virtue of office or position actually exercises discretion with respect to that power." *Id.*

(City's Brief at 17-19.)

{¶ 46} The *Elston* court rejected the school district's assertion that the defense under R.C. 2744.03(A)(3) applied to a baseball coach's actions, because there had been no showing that the coach's position involved policy-making, planning, or enforcement powers and, without more, that position did "not involve 'the exercise of a high degree of official judgment of discretion.' " *Elston* at 321, quoting *Reynolds v. State Div. of Parole & Community Servs.*, 14 Ohio St.3d 68 (1984), paragraph one of the syllabus. The Supreme Court held that R.C. 2744.03(A)(3) did not apply to the coach's actions and did not provide the school district with a defense.

{¶ 47} The City argues that the holding of the *Elston* court supports its position here:

> Thus the Supreme Court applied the defense under R.C. 2744.03(A)(5) to the exercise of judgment or discretion by an employee of a political subdivision even though it determined the coach's position and exercise of judgment or discretion did not involve policy-making, planning or the exercise of a high degree of official judgment or discretion. The Supreme Court explicitly restricted that standard to the application of the defense under R.C. 2744.03(A)(3). And although [the Dearths] argue "[t]he holding in *Yonkings* is difficult to square with the other cases" cited in their brief, the decision in *Elston* demonstrates the holding in *Yonkings* * * * is compatible with the Supreme Court's interpretation and application of the defense under R.C. 2744.03(A)(5). Appellants' Brief, p. 19. Therefore, [the Dearths'] argument that R.C. 2744.03(A)(5) only reinstates immunity when the exercise of judgment or discretion involves policy-making, planning, or the exercise of a high degree of official judgment or discretion conflates the defenses under R.C. 2744.03(A)(3) and 2744.03(A)(5). Since the City did not argue below the defense under R.C. 2744.03(A)(3) applies to reinstate its immunity, there is no need to determine whether or not Burt or Craft's exercise of judgment or discretion involved policy-making, planning, or a high degree of official judgment or discretion.

(Emphasis sic.) (City's Brief at 20-21.)

{¶ 48} The City's arguments are well-taken.  Accordingly, we find that the affidavits of Burt and Craft support the City's claim for reinstatement of immunity under R.C. 2744.03(A)(5).  They establish that the City personnel exercised their judgment in the application of the City's policy in deciding how to prioritize and allocate resources in responding to reports of multiple leaks; this constitutes the exercise of judgment or discretion sufficient for the purposes of the defense asserted.  In so doing, the City's employees actions comport with this Court's holding that, "[i]n order to demonstrate an exercise of discretion for which R.C. 2744.03(A)(5) confers immunity, there must be " ' "[s]ome positive exercise of judgment that portrays a considered adoption of a particular course of conduct in relation to an object to be achieved." ' " *Yonkings* at ¶ 30, quoting *Bush v. Beggrow*, 10th Dist. No. 03AP-1238, 2005-Ohio-2426, ¶ 57, quoting *Addis v. Howell*, 137 Ohio App.3d 54, 60 (2d Dist.2000).

{¶ 49} Based on our de novo review of the record, we find that the City is entitled to the immunity conferred by R.C. 2744.03(A)(5) making summary judgment appropriate. Accordingly, we hold that the trial court did not err in granting the City's motion for summary judgment.  The Dearths' assignment of error is overruled.

## IV.  CONCLUSION

{¶ 50} For the foregoing reasons, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LUPER SCHUSTER and HORTON, JJ., concur.