[Cite as *Michael v. Worthington City School Dist.*, 2020-Ohio-1134.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Jay E. Michael, as Administrator of the :
Estate of Franklin Clark,

                                              :

         Plaintiff-Appellant,                        No. 19AP-145

                                                :               (C.P.C. No. 18CV-1451)

v.

                                              :             (REGULAR CALENDAR)

Worthington Ohio City School District
et al.,                                          :

         Appellees-Appellees.            :

---

D E C I S I O N

Rendered on March 26, 2020

---

**On brief**: *The Fitch Law Firm*, and *John K. Fitch*; *Taft Stettinius & Hollister*, *LLP*, and *Stephen C. Fitch*, for appellant. **Argued**: *Stephen C. Fitch*.

**On brief**: *Hanna, Campbell & Powell, LLP*, *Douglas G. Leak*, *Kenneth A. Calderone*, and *Catherine E. Nagy*, for appellees Worthington City School District, Thomas Worthington High School, Worthington Board of Education, Sean Luzader, Brian Luthy, William Romine, and Jake Guthrie; *Freund, Freeze & Arnold*, and *Christopher W. Carrigg*, co-counsel for William Romine. **Argued**: *Douglas G. Leak*.

---

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} Plaintiff-appellant, Jay E. Michael, as Administrator of the Estate of Franklin Clark ("the estate"), appeals from a judgment of the Franklin County Court of Common Pleas, in which the court granted three motions for summary judgment filed by defendants-

appellees, (1) Worthington City School District ("school district"), Thomas Worthington High School ("TWHS"), and Worthington Board of Education ("board of education"), (2) Sean Luzader and Brian Luthy, and (3) William Romine and Jake Guthrie.

{¶ 2} At the time of the events pertinent to this case, Luzader was the head boys' varsity basketball coach at TWHS. Luthy, Romine, and Guthrie were TWHS assistant boys' basketball coaches. Scott Dorne was the athletic director of the school district. Trent Bowers was the superintendent of the school district. Pete Scully was the principal of TWHS. Franklin "Eric" Clark ("Clark") played basketball at TWHS and was 16 years old at the time of his death. Laura Clark ("Ms. Clark") is Clark's mother.

{¶ 3} Since 2002, the TWHS boys' varsity basketball team had taken a yearly trip to Fripp Island, South Carolina to participate in practices, scrimmages, team bonding experiences, and recreational activities. On March 31, 2017, Luzader sent an e-mail to the parents of TWHS basketball players providing information about a planned trip to Fripp Island as a team. On June 1, 2017, Luzader held a meeting with the parents to discuss the trip. Before the trip, Ms. Clark signed a release of liability form.

{¶ 4} On June 10, 2017, Guthrie drove several basketball players, including Clark, to Fripp Island in the school district van, arriving at approximately 7:00 p.m. The coaches' wives and some of their children also went to Fripp Island. The 14 players, coaches, and family members stayed in a rented beachfront house together.

{¶ 5} The next morning, June 11, 2017, the team practiced at a park basketball court and then returned to the house to eat breakfast. Luzader then held a meeting for the team at which he gave safety instructions including using the "buddy system" and staying in water where they could touch the bottom. After the meeting, Romine and his wife took some players to the community swimming pool, some players stayed at the house, and others, including Clark, went to the beach with Luzader and Luthy. Guthrie went fishing on the beach.

{¶ 6} Luthy started fishing with Guthrie approximately eight houses down from their house. After approximately 20 minutes, Luthy walked back to the house. He stopped to talk to the next-door neighbors but was watching the players on the beach and in the water.

{¶ 7}   Luzader was walking the beach when he saw one basketball player, Jalen Sullinger, in the water with a boogie board.  Luzader approached Sullinger in the water to talk to him about swimming alone.  Luzader then saw that Isaac Settles was out farther in the water, and that Clark and Maurice Collins, III, were even farther out.  He yelled at the three boys to come closer and one boy gave him a thumbs up.  Very quickly, Luzader realized that something might be wrong, told Sullinger to call 911, and started to swim to help the players.  Luzader reached Settles first, who was not in any distress and who was swimming in to get help.  He saw Collins and Clark bobbing but then saw only one head.  When Luzader reached Collins, he helped him to safety, but when he turned back Luzader could not locate Clark.  Clark's body was found the next day by the Beaufort Water Search and Rescue Team.

{¶ 8}   On February 16, 2018, the estate filed a complaint against the school district, the board of education, the city of Worthington, TWHS, Bowers, Dorne, Scully, Luzader, Guthrie, Romine, and Luthy, alleging claims of negligence resulting in wrongful death and a survivorship claim.  The estate dismissed the city of Worthington on March 2, 2018.  On June 28, 2018, the estate filed an amended complaint, adding a claim for willful, wanton, reckless, and intentional misconduct.  On December 18, 2018, the estate voluntarily dismissed Bowers, Dorne, and Scully  On January 31, 2019, the court issued a decision finding the motion filed by Bowers, Dorne, and Scully moot, and granting the motions for summary judgment of all remaining defendants.  The estate asserts the following eight assignments of error:

> [I.]  The trial court erred by granting Defendants-Appellees' motions for summary judgment.
>
> [II.]  The trial court erred in placing the burden of showing no genuine issue of material fact on the Plaintiff-Appellant.
>
> [III.] The trial court erred by holding that Defendants-Appellees Thomas Worthington City School District, Thomas Worthington High School, and the Worthington Board of Education were afforded governmental immunity pursuant to R.C. 2744.02.
>
> [IV.] The trial court erred by holding that Defendants-Appellees Thomas Worthington City School District, Thomas

Worthington High School, and the Worthington Board of Education enjoyed absolute defenses under R.C. 2744.03.

[V.] The trial court erred by holding that a liability waiver signed by the mother of Decedent Eric Clark waived all claims for negligence by all potential claimants against all Defendants.

[VI.] The trial court erred in holding that Defendants-Appellees Luzader, Luthy, Romine and Guthrie were entitled to immunity under 2744.03(A)(6).

[VII.] The trial court erred by holding that there was no genuine issue of material fact as to whether Defendants-Appellees Luzader, Luthy, Romine, and Guthrie acted in a wanton or reckless manner.

[VIII.] The trial court erred by holding that Plaintiff-Appellant's claims were barred by the recreational user doctrine.

{¶ 9} The estate argues in its first assignment of error the trial court erred when it granted appellees' motions for summary judgment. However, the estate does not present a separate argument under this assignment of error. Instead, the estate presents its actual arguments in the remaining assignments of error, which we will address first. Summary judgment is appropriate when the moving party demonstrates that: (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion when viewing the evidence most strongly in favor of the non-moving party, and that conclusion is adverse to the non-moving party. *Hudson v. Petrosurance, Inc.*, 127 Ohio St.3d 54, 2010-Ohio-4505, ¶ 29; *Sinnott v. Aqua-Chem, Inc.*, 116 Ohio St.3d 158, 2007-Ohio-5584, ¶ 29. Appellate review of a trial court's ruling on a motion for summary judgment is de novo. *Hudson* at ¶ 29. This means that an appellate court conducts an independent review, without deference to the trial court's determination. *Zurz v. 770 W. Broad AGA, LLC*, 192 Ohio App.3d 521, 2011-Ohio-832, ¶ 5 (10th Dist.); *White v. Westfall*, 183 Ohio App.3d 807, 2009-Ohio-4490, ¶ 6 (10th Dist.).

{¶ 10} When seeking summary judgment on the ground that the non-moving party cannot prove its case, the moving party bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate

the absence of a genuine issue of material fact on an essential element of the non-moving party's claims. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). The moving party does not discharge this initial burden under Civ.R. 56 by simply making a conclusory allegation that the non-moving party has no evidence to prove its case. *Id.* Rather, the moving party must affirmatively demonstrate by affidavit or other evidence allowed by Civ.R. 56(C) that the non-moving party has no evidence to support its claims. *Id.* If the moving party meets its burden, then the non-moving party has a reciprocal burden to set forth specific facts showing that there is a genuine issue for trial. Civ.R. 56(E); *Dresher* at 293. If the non-moving party does not so respond, summary judgment, if appropriate, shall be entered against the non-moving party. *Id.* It is with these tenets in mind that we address the estate's arguments.

{¶ 11} The estate argues in its second assignment of error the trial court erred when it placed the burden of demonstrating that no genuine issue of material fact existed upon the estate, rather than appellees. The estate sets forth this argument because the trial court discussed the burden of proof using an example of "when a plaintiff moves for summary judgment." However, when setting forth the standard used in determining whether to grant a motion for summary judgment, the trial court discussed the burden in terms of the movant and "the party against whom the motion is made." (Jan. 31, 2019 Decision at 3.) The estate provides no other evidence or argument that the trial court applied the standard inappropriately. The estate's second assignment of error is overruled.

{¶ 12} The estate argues in its third assignment of error the trial court erred when it held that the school district, TWHS, and the board of education were afforded governmental immunity pursuant to R.C. 2744.02. The estate argues the trial court improperly applied immunity to the school district, TWHS, and the school board because the trip was too tenuously related to the operation of a school district to be considered a governmental function and the coaches' negligence in failing to have a safety plan and failing to supervise is not covered by the immunity contemplated in R.C. 2744.03(A)(3) or (5).

{¶ 13} The Political Subdivision Tort Liability Act, R.C. Chapter 2744, provides that political subdivisions, their departments and agencies, and their employees are generally immune from liability for their actions. *Dearth v. Columbus*, 10th Dist. No. 17AP-346,

2019-Ohio-556, ¶ 28. " 'Whether a political subdivision is immune from civil liability is purely a question of law, properly determined prior to trial and preferably on a motion for summary judgment.' " *Id.*, quoting *Yonkings v. Piwinski*, 10th Dist. No. 11AP-07, 2011-Ohio-6232, ¶ 18, citing *Conley v. Shearer*, 64 Ohio St.3d 284, 292 (1992), citing *Roe v. Hamilton Cty. Dept. of Human Servs.*, 53 Ohio App.3d 120, 126 (1st Dist.1988).

{¶ 14} To determine whether a political subdivision is entitled to immunity under R.C. Chapter 2744, a court must engage in a three-tiered analysis. *Needham v. Columbus*, 10th Dist. No. 13AP-270, 2014-Ohio-1457. In the first tier, a court applies the general grant of immunity contained in R.C. 2744.02(A)(1), providing that " ' "a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." ' " *Id.* at ¶ 6, quoting *Lambert v. Clancy*, 125 Ohio St.3d 231, 2010-Ohio-1483, ¶ 8. This grant of immunity is not absolute and is subject to the five exceptions provided in R.C. 2744.02(B)(1) through (5). *Id.*, citing *Greene Cty. Agricultural Soc. v. Liming*, 89 Ohio St.3d 551, 557 (2000). The second tier of the immunity analysis requires a court to determine whether any of these five exceptions apply to the facts. *Id.* Finally, in the third tier of the analysis, if the facts of the case fall within any of the five exceptions, the court must consider whether any of the defenses to liability contained in R.C. 2744.03 reinstate immunity. *Id.*

{¶ 15} In the present case, it is undisputed the school district, TWHS, and the board of education are part of a political subdivision as defined in R.C. 2744.01(F)[1] and the coaches are employees employed by the school district, and that "[t]he provision of a system of public education" is a governmental function pursuant to R.C. 2744.01(C)(2)(c). It is well-recognized that a political subdivision acts through its employees. *Elston v. Howland Local Schools*, 113 Ohio St.3d 314, 2007-Ohio-2070. This court, and other Ohio courts, have held that the governmental function of providing public education "extends to most school activities and administrative functions of the educational process, even if not directly comprising part of the classroom teaching process." *Perkins v. Columbus Bd. of Edn.*, 10th

---

[1] R.C. 2744.01(F) defines "Political subdivision" as "a municipal corporation, township, county, school district."

Dist. No. 13AP-803, 2014-Ohio-2783, ¶ 12. Therefore, the general grant of immunity under R.C. 2744.02(A)(1) applies in this case.

{¶ 16} The second tier in the analysis focuses on the exceptions to immunity in R.C. 2744.02(B). Pursuant to R.C. 2744.02(B), a political subdivision may be held liable for damages in a civil action for: (1) the negligent operation of a motor vehicle, (2) the negligent performance of a proprietary function, defined in R.C. 2744.01(G), (3) the negligent failure to keep public roads in repair and free of obstacles, (4) the negligent failure to keep public grounds and buildings free of physical defects, or (5) when a section of the Revised Code expressly imposes civil liability upon the political subdivision. The trial court found that none of the exceptions to immunity applied to these facts, and even if one of the exceptions were applicable, the trial court found defendants have an absolute defense to liability under R.C. 2744.02(A)(3) and (5). The estate argues the immunity statutes do not confer protection to the school district, the board of education, and TWHS because the R.C. 2744.02(B)(2) exception applies, arguing the trip was too tenuously related to the operation of a school district to be considered a governmental function and further, R.C. 2744.03(A)(3) and (5) do not cover the coaches' negligence. The estate contends that political subdivisions are liable for the negligent acts of its employees in the undertaking of proprietary functions.

{¶ 17} The trial court found the purpose of the trip to Fripp Island was to conduct organized practices and scrimmages, to develop close team relationships, foster bonding among team members, and experience other geographic regions and cultures. Given that purpose, the trial court concluded the team trip falls under the governmental function of providing a "public education." Therefore, the court concluded because defendants were engaged in a governmental function at the time of the incident, the school district, TWHS, and the board of education are entitled to a general grant of immunity under R.C. 2744.02(A)(1).

{¶ 18} A proprietary function is defined as one that is not a governmental function and "one that promotes or preserves the public peace, health, safety, or welfare and that involves activities that are customarily engaged in by a nongovernmental persons." R.C.

2744.01(G)(1)(b).[2] Proprietary functions include the operation of a hospital, a public cemetery, a utility such as a light, gas, power, or heat plant, a railroad, a business or other transit company, an airport, and a municipal corporation water supply system, a sewer system, a public stadium, auditorium, civic or social center, exhibition hall, arts and crafts center, band or orchestra, or off-street parking facility.  R.C. 2744.01(G)(2)(c).  Many Ohio courts have interpreted extracurricular activities as an extension of the educational process and found political subdivisions entitled to immunity.  *See Perkins* (alleged failure to comply with statutory reporting requirements); *Elston* (injury during baseball practice); *DeMartino v. Poland Local School Dist.*, 7th Dist. No. 10MA19, 2011-Ohio-1466 (injury during band practice in a school band not a "public" band and, thus, an extension of the school's music program); *Doe v. Massillon City School Dist.*, 5th Dist. No. 2006CA00227, 2007-Ohio-2801 (assault during after school chess club); *Neelon v. Conte*, 8th Dist. No. 72646 (Nov. 13, 1997) (cheerleader videotaped in bathroom during party at school principal's house); *Frederick v. Vinton Cty. Bd. of Edn.*, 4th Dist. No. 03CA579, 2004-Ohio-550 (second grader injured from fall on playground); *Schnarrs v. Girard Bd. of Edn.*, 168 Ohio App.3d 188, 2006-Ohio-3881 (11th Dist.) (player injured during basketball practice). Ohio courts have held that coaching athletic teams is a governmental function.

{¶ 19} Furthermore, the Fripp Island trip was an authorized school event.  The trip was organized by the head varsity coach, Luzader.  Luzader's job description indicates that the job is year-round, and the trip counted toward the number of days that Luzader is permitted to provide organized basketball instruction to the team per the Ohio High School Athletic Association ("OHSAA") guidelines.  The athletic director (Dorne), TWHS principal (Scully), the superintendent (Bowers) were aware of and approved the Fripp Island trip. The school district provided a vehicle to transport players.  The team wore school practice uniforms and participated in a practice on the morning of June 11, 2017.   Other practices and scrimmages against other teams were scheduled for the five days.

---

[2] R.C. 2744.01(G)(1) defines "Proprietary function" as "a function of a political subdivision that is specified in division (G)(2) of this section or that satisfies both of the following: (a) The function is not one described in division (C)(1)(a) or (b) of this section and is not one specified in division (C)(2) of this section; (b) The function is one that promotes or preserves the public peace, health, safety, or welfare and that involves activities that are customarily engaged in by nongovernmental persons."

{¶ 20} The estate cites *Greene Cty.* for the proposition that a trip to the beach and swimming in the ocean are activities that non-governmental persons typically conduct, and we must examine the activities on the trip as discrete components to determine whether it was a governmental or proprietary function. In *Greene Cty.*, the county agricultural society conducted a livestock competition at the county fair and an investigation into the allegations of irregularity surrounding one of the hogs in the competition. The Supreme Court of Ohio determined the agricultural society was a political subdivision but that having the society conduct a livestock competition at a county fair was a proprietary function.

{¶ 21} The Supreme Court specifically stated that "[i]n a situation such as the present case, when the political subdivision at issue is not one of the bodies specifically mentioned within R.C. 2744.01(F), the exceptions to immunity of R.C. 2744.02(B) should be construed in a way that leads to a finding of immunity for only the central core functions of the political subdivision. If the exceptions in R.C. 2744.02(B) are interpreted too expansively in this situation, the balance of competing interests reflected in the structure of R.C. Chapter 2744 is undermined." *Id.* at 560-61. However, *Greene Cty.* is distinguishable from this case.

{¶ 22} In *Greene Cty.*, the court focused on R.C. 2744.01(C)(1)(c) which defines a governmental function as a "function that promotes or preserves the public peace, health, safety, or welfare; that involves activities that are not engaged in or not customarily engaged in by nongovernmental persons; and that is not specified in division (G)(2) of this section as a proprietary function." The court concluded that conducting a livestock competition is an activity customarily engaged in by non-governmental persons and, thus, the activity was proprietary. In this case, the coaches, as employees of the political subdivision took the players on a trip to practice basketball and bond as a team. Such a trip is not an activity customarily engaged in by non-governmental persons. The activity here is a governmental function.

{¶ 23} And as we stated, a political subdivision acts through its employees. *Elston.* None of the exceptions in R.C. 2744.02(B) apply to these facts. The trial court found that even if one of the exceptions in R.C. 2744.02(B) applied, the school district, the board of education, and TWHS had an absolute defense to liability pursuant to R.C. 2744.03(A)(3) and (5) in the third tier of the analysis. R.C. 2744.03 provides in pertinent part:

(A) In a civil action brought against a political subdivision or an employee of a political subdivision to recover damages for injury, death, or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function, the following defenses or immunities may be asserted to establish nonliability:

* * *

(3) The political subdivision is immune from liability if the action or failure to act by the employee involved that gave rise to the claim of liability was within the discretion of the employee with respect to policy-making, planning, or enforcement powers by virtue of the duties and responsibilities of the office or position of the employee.

* * *

(5) The political subdivision is immune from liability if the injury, death, or loss to person or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner.

{¶ 24} Ohio courts have applied this R.C. 2744.03(A)(3) immunity to an athletic coach's discretionary policy making, planning, and enforcement powers with respect to activities associated with the athletic program. *See Schnarrs* at ¶ 35 (basketball coach "was vested with significant discretion in managing the affairs of the girl's varsity basketball team such that his actions pertaining thereto could be reasonably construed as involving the type of discretion contemplated by R.C. 2744.03(A)(3)"); *Pope v. Trotwood-Madison City School Dist. Bd. of Edn.*, 2d Dist. No. 20072, 2004-Ohio-1314 (the coach participating and supervising the open gym basketball games was within his discretion); *Starkey v. Hartzler*, 9th Dist. No. 96CA0048 (Mar. 26, 1997) (middle school football coach's method of discipline was within his discretion).

{¶ 25} Exhibit 1 to Luzader's deposition is a head coach job description and demonstrates his responsibilities as head coach included off-season team activities "[w]ithin the OHSAA, OCC [Ohio Capital Conference], and District guidelines, implement appropriate out of season activities for sports participants." The assistant coach's job

description also includes"[a]ssist with the proper out-of-season activities for participants in the sport, within the guidelines of the OHSAA and the School District." The school district delegated to Luzader the authority to plan and coordinate the trip, its activities, and the authority to set and enforce the safety rules for the trip. Luzader decided to use five of his OHSAA off-season coaching days on the trip. The coaches were responsible for supervising the players the entire time during the trip. The planning and enforcing policies and procedures during the trip involved the coaches' judgment or discretion and were within the R.C. 2744.03(A)(3) discretionary policy making, planning, and enforcement authority and, thus, the R.C. 2744.03(A)(3) defense applies and the school district, the board of education, and TWHS are immune from liability.

{¶ 26} The trial court also found the school district, the board of education and TWHS immune from liability under the third tier pursuant to R.C. 2744.03(A)(5). In *Elston* at ¶ 20, the Supreme Court recognized that teachers and coaches have wide discretion in supervising students and this discretion falls within R.C. 2744.03(A)(5) immunity, as follows:

> Furthermore, teachers and coaches, as employees of a political subdivision, have "wide discretion under R.C. 2744.03(A)(5) to determine what level of supervision is necessary to ensure the safety of the children in" their care. See *Marcum v. Talawanda City Schools* (1996), 108 Ohio App.3d 412, 416, 670 N.E.2d 1067; see, also, *Frederick v. Vinton Cty. Bd. of Edn.*, Vinton App. No. 03CA579, 2004-Ohio-550, ¶ 43. In *Marcum*, a student suffered injury at the hands of other students when a teacher left a student council meeting of students in her classroom unsupervised to attend a faculty meeting. 108 Ohio App.3d at 414, 670 N.E.2d 1067. The court of appeals held that the Talawanda City School District was immune from liability and determined that the teacher's decision to leave the students unattended was within the scope of her discretionary authority pursuant to R.C. 2744.03(A)(5). *Marcum* at 416, 670 N.E.2d 1067.

{¶ 27} The decisions regarding supervising the players fell within the coaches' discretionary authority to determine the level of supervision necessary. The estate contends the coaches exercised that judgment or discretion with malicious purpose, in bad faith, or in a wanton and reckless manner and that the coaches failed to supervise the players and that failure resulted in Clark's death.

{¶ 28} "Malicious purpose 'means the "willful and intentional design to do injury, or the intentional or desire to harm another, usually seriously, through * * * unlawful or unjustified" conduct.' " *Hayes v. Columbus*, 10th Dist. No. 13AP-695, 2014-Ohio-2076, ¶ 26, quoting *VanDyke v. Columbus*, 10th Dist. No. 07AP-918, 2008-Ohio-2652, ¶ 13, quoting *Cook v. Hubbard Exempted Village Bd. of Edn.*, 116 Ohio App.3d 564, 569 (11th Dist.1996). "Bad faith denotes a 'dishonest purpose, moral obliquity, conscious wrong doing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. ' " *VanDyke* at ¶ 13, quoting *Jackson v. McDonald*, 144 Ohio App.3d 301, 309 (5th Dist.2001). "Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, paragraph three of the syllabus. "Reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id.* at paragraph four of the syllabus. "Recklessness is a perverse disregard of a known risk. Recklessness, therefore, necessarily requires something more than mere negligence. The actor must be conscious that his conduct will in all probability result in an injury." *O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, paragraph three of the syllabus.

{¶ 29} The estate argues the coaches wantonly and recklessly failed to properly prepare for a known danger. Thus, the coaches had to have been aware of a great probability of harm and failed to exercise any care or consciously disregarded or were indifferent to a known or obvious risk of harm to another that is unreasonable under the circumstances and their conduct had to have been substantially greater than negligent conduct. The estate contends the coaches recklessly failed to follow basic protocols of water safety and management in the face of a grave and known danger. The affidavit of the estate's expert, Gerald Dworkin, criticized the safety plan of the coaches. Dworkin testified that the coaches engaged in "willful, wanton, and reckless misconduct" because the coaches did not assess the ability of the players to swim in an ocean environment known for rip currents, the coaches created a buddy system which was likely to put two or more players at risk, the coaches told the players they could go in the water as long as they could touch bottom, which could be up to their chin, and no coach was supervising Clark before he drowned.

{¶ 30} The coaches took several steps to exercise a degree of care for the players. Initially, Luzader sent a letter to the parents inviting the players to the trip. The parents were sent information through e-mail regarding Fripp Island including a web link to the house, a web link to information about Fripp Island, and rip currents information. Before the trip, the coaches conducted a meeting with the parents to discuss the trip. They provided the beach house address and a daily itinerary. All the boys were asked if they could swim, and Luthy testified that during the parent meeting, he asked Ms. Clark whether Clark could swim.

{¶ 31} During the drive to Fripp Island, while Guthrie was driving, he discussed with the boys the dangers of the water and tides and safety. Collins testified Clark responded to Guthrie that if he were caught in a current, he would let it take him. Settles also testified regarding Clark's response. The morning after everyone arrived at Fripp Island, after basketball practice, the coaches held a safety meeting and discussed rules for the players, including talking about the ocean, tides, sandbars, and the weather, including high winds or stormy weather, no swimming in the ocean further than if the player could touch bottom, and to follow the buddy system at all times. Guthrie testified he checked with an app on his phone to determine the tides and walked the beach to check the waves and the weather before any players went to the beach. Luthy and Luzader were supervising the players on the beach immediately before the accident (Romine was supervising players at the swimming pool and Guthrie was fishing further down the beach at the time of the accident). Further, Luthy and Luzader's wives were on the deck and also chaperoning players. Luthy testified he was watching the players in the water.

{¶ 32} There is no evidence the coaches acted with a malicious purpose or a willful and intentional design to do injury to Clark, or in bad faith, with a dishonest purpose, moral obliquity, conscious wrong doing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. There is no evidence that any of the coaches intended to harm Clark. In fact, there was testimony that the players and coaches thought of each other like family, including the coaches' wives, and had a close relationship. Furthermore, the coaches exercised a degree of care toward the players in an effort to keep them safe and, therefore, their actions cannot be characterized as wanton since wanton misconduct is the failure to exercise any care.

{¶ 33} Reckless behavior is characterized as the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct. The estate contends that Clark was caught in a rip current and drowned as a result and the coaches were warned of the dangers of rip currents at Fripp Island but did not adequately prepare a safety plan.

{¶ 34} Although the coaches were aware that rip currents are possible along the coasts of the United States,[3] and the estate argued that Fripp Island security provided literature regarding rip current dangers to all visitors, there was no evidence of a prior drowning on Fripp Island beach. Clayton Emminger testified he has lived in Beaufort County all his life (other than when he was in the Air Force) and is a member of the Beaufort Water Search and Rescue Team and he has never witnessed a rip current on or close to Fripp Island beach. He is unaware of a history of rip currents forming along Fripp Island beach. Further, to his knowledge, Clark's drowning was the only drowning incident on Fripp Island beach. David Refosco, the First Mate of Beaufort Water Search and Rescue, who acted as the beachmaster during the incident, testified he has never responded to a mission on Fripp Island that involved a rip current. He was unaware of any prior drowning incidents occurring along the Fripp Island beach area. Refosco testified Fripp Island beach does not have a history of rip currents occurring along the beach.

{¶ 35} The estate's expert, Dworkin testified that Beaufort County has no reporting agencies, however, Charleston County, one county north of Beaufort, has a reporting agency and had 57 rescues due to rip currents in 2017. However, Dworkin provided no evidence that Fripp Island beach presented a known or obvious risk of harm that is unreasonable under the circumstances.

{¶ 36} Further, in his affidavit, Dworkin testified that the coaches "engaged in willful, wanton, and reckless misconduct." (Dworkin Aff. at ¶ 14.) Such legal conclusions by an expert do not automatically create an issue of fact, but merely states appellant's position, which is a legal conclusion. Such a determination, the determination of whether

---

[3]"Rip currents are powerful, narrow channels of fast-moving water that are prevalent along the East, Gulf, and West coasts of the U.S., as well as along the shores of the Great Lakes. Moving at speeds of up to eight feet per second, rip currents can move faster than an Olympic swimmer. * * * While the terms are often confused, rip currents are different than rip tides. A rip tide is a specific type of current associated with the swift movement of tidal water through inlets and the mouths of estuaries, embayments, and harbors." National Ocean Service https://oceanservice.noaa.gov/facts/ripcurrent.html.

the coaches' actions constituted willful and wanton misconduct, is the ultimate question for resolution. It requires a determination of whether the evidence demonstrated appellees intentionally failed to prepare for a known danger or established an absence of all care for the safety of the players. Expert testimony on the ultimate issue in this case was not necessary for the court to make that determination. *Blair v. Columbus Div. of Fire*, 10th Dist. No. 10AP-575, 2011-Ohio-3648, citing *Donlin v. Rural Metro Ambulance, Inc.*, 11th Dist. No 2002-T-0148, 2004-Ohio-1704, ¶ 26, citing *Hackathorn v. Preisse*, 104 Ohio App.3d 768 (9th Dist.1995).

{¶ 37} As outlined, the coaches took steps to implement a safety plan. Guthrie specifically talked to the players in the van during the drive to Fripp Island regarding the ocean and tides and explained to the players the steps to take if caught in a current. Clark was involved in that conversation. Luzader testified that he was walking on the beach and noticed four boys in the water. Sullinger was closer to the beach. Luzader walked to Sullinger to admonish him for not following the safety plan because he was not with a buddy. Luzader was observing Clark, Collins, and Settles in the water and waved to them to come in closer. Sullinger testified that Luzader called the other three players to come closer to shore. Luzader believes one of them acknowledged him with a thumbs up signal. Settles testified that Luzader was waving them into shore, but the three players tried to move out further into the ocean. Luzader testified he sensed something was wrong and he entered the water to attempt to reach the players. Luzader was able to get Settles and Collins to safety but could not find Clark.

{¶ 38} Further, Luzader and Sullinger testified they did not feel a rip current but only felt the normal pull of the waves. Settles testified that he felt a pull at his feet, not a pull at the surface of the water, and when he swam toward the shore for help, he swam straight into shore. Collins testified that the players were in the water up to their necks (he was 6'3") and a big wave crashed over them and knocked them over. He believes Clark began yelling for help because he may have had a cramp and with the big waves and deep water, he began drowning. Settles testified that he believed they were too far from shore when Clark began saying, "[c]hill, chill." (Settles Depo. at 18.) Settles did not know why Clark was in distress but also thought Clark may have had a cramp.

{¶ 39} Given these facts and circumstances, we cannot say the coaches acted recklessly or consciously disregarded or acted indifferently to a known or obvious risk of harm that is unreasonable under the circumstances and is substantially greater than negligent conduct. The coaches' acts or omissions were not made with a malicious purpose, bad faith, or in a wanton or reckless manner. Thus, the school district, the board of education, and TWHS are immune from liability. The exceptions to liability in R.C. 2744.02(B) do not apply and even if an exception applied, the defenses in R.C. 2744.03(A)(3) and (5) would reinstate immunity. The estate's third assignment of error is overruled.

{¶ 40} Our findings further overrule the estate's fourth, sixth, and seventh assignments of error. In its fourth assignment of error, the estate contends the trial court erred when it held that the school district, TWHS, and the board of education enjoyed absolute defenses under R.C. 2744.03. The estate argued in its sixth assignment of error the trial court erred when it held that Luzader, Luthy, Romine, and Guthrie were entitled to immunity under R.C. 2744.03(A)(6). Finally, in its seventh assignment of error, the estate argued the trial court erred when it held that there was no genuine issue of material fact as to whether Luzader, Luthy, Romine, and Guthrie acted in a wanton or reckless manner. We found the coaches did not act in a wanton or reckless manner, thus, they are entitled to immunity pursuant to R.C. 2744.03(A)(6)(b). We have addressed these assignments of error within our discussion of the second assignment of error and find no merit to the estate's arguments and overrule the fourth, sixth, and seventh assignments of error.

{¶ 41} The estate argues in its fifth assignment of error the trial court erred when it held that a liability waiver signed by Ms. Clark waived all claims for negligence by all potential claimants against all appellees. The estate argues in its eighth assignment of error the trial court erred when it held the estate's claims were barred by the recreational user doctrine. These assignments of error have been rendered moot by our rulings on the other assignments of error.

{¶ 42} Having overruled or rendered moot all of the assignments of error that the estate argues are reasons the trial court erred in granting appellees' summary judgment

motions, we find the trial court did not err in granting appellees' motions for summary judgment and also overrule the first assignment of error.

{¶ 43} For the foregoing reasons, the estate's first, second, third, fourth, sixth, and seventh assignments of error are overruled, the estate's fifth and eighth assignments of error are rendered moot, and the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

KLATT and BEATTY BLUNT, JJ., concur.

_____