NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0522n.06

No. 10-3292

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**

***Jul 27, 2011***

LEONARD GREEN, Clerk

|  |  |  |
|---|---|---|
| JOHN VALENTE, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| UNIVERSITY OF DAYTON, | ) | SOUTHERN DISTRICT OF OHIO |
| | ) | |
| Defendant-Appellee. | ) | |

Before: BOGGS, GILMAN, and COOK, Circuit Judges.

COOK, Circuit Judge. In early 2008, the University of Dayton School of Law suspended John Valente for Honor Code violations.[1] The decision followed an Honor Council disciplinary hearing where members found Valente guilty of cheating on an exam. Valente, proceeding pro se, sued Dayton for breach of contract, promissory estoppel, and various torts. After an extensive discovery period, the district court awarded summary judgment to the University on all claims. Valente now appeals. We affirm the lower court's decision.

---

[1]The Defendant-Appellee in this case is the University of Dayton, the *sui juris* entity. In all respects in this case, the University acted through its law school. For the purposes of this opinion, the terms "the University" and "Dayton" refer to the University of Dayton; meanwhile, "UDSL" and "the Law School" reference the University of Dayton School of Law specifically.

I.

At the close of the Fall 2007 Semester, UDSL officials notified Valente that another student had accused him of Honor Code violations during final exams, and that they might summon him for a disciplinary hearing, should the Honor Council's ongoing investigation reveal probable cause for the alleged offenses. Over the following weeks, the Council researched the complaint, interviewed potential witnesses and gathered relevant documents. After completing this task, the Council members concluded that there was probable cause to believe that Valente violated the Honor Code. In particular, their findings suggested that (1) Valente received test questions for his upcoming criminal-law examination from a classmate who had already taken that exam, and (2) Valente relayed these questions to another student—both in potential violation of the Honor Code.

Toward the end of January, the Law School informed Valente of the specific allegations and scheduled a disciplinary hearing for early February. It also provided him a "Discovery Packet," which included a summary of the Honor Council's investigation, a list of potential witnesses (and their expected testimony), and copies of all documents that the prosecution intended to introduce. Upon receiving these materials, Valente sued the University in federal district court, moving to preliminarily enjoin the Honor Council hearing. When the district court denied Valente's motion, he voluntarily dismissed the case and the hearing continued, albeit a few days delayed.

The disciplinary hearing proceeded much like a criminal trial. First, a student prosecutor read the charges against Valente: five separate violations of the Law School Honor Code. Next, the court

heard opening statements. Then, during their respective cases-in-chief, both the prosecutor and Valente presented exhibits and interviewed witnesses, whom the other side then cross-examined. Finally, each side offered closing arguments. At the close of the proceedings, a seven-student panel retired for deliberation, then issued a written opinion in which it found Valente guilty of all five Honor Code violations. The Law School, adopting the panel's recommended sentence, suspended Valente for at least three semesters.

In July 2008, Valente reinstated his suit against the University, alleging various claims, including breach of contract and several torts. He also sought another preliminary injunction, this time demanding immediate reinstatement to UDSL. The district court held a two-day evidentiary hearing before denying Valente's motion. It subsequently granted summary judgment in favor of the University. In its opinion, the court held that (1) Dayton had substantially complied with the terms of any implied contract resulting from the parties' student-university relationship, and (2) to the extent it could construe Valente's claims under tort and other theories, those claims were precluded by his contract claims or lacked sufficient evidence. Valente appeals.

## II.

### A.     Standard of Review

We review de novo a district court's grant of summary judgment. *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). Summary judgment is proper "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party meets its initial burden, the nonmovant "must set forth specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 n.3 (1986) (internal quotation marks and citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). But in making our determination, we may not "weigh the evidence and determine the truth of [any disputed] matter," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); we must instead view the facts in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party, *Matsushita*, 475 U.S. at 587–88.

Because this action involves an Honor Code dispute between a university and its student, contractual theories underlie our analysis. *See Behrend v. State*, 379 N.E.2d 617, 620 (Ohio Ct. App. 1977) ("Generally . . . when a student enrolls in a college or university, pays his or her tuition and fees, and attends such school, the resulting relationship may reasonably be construed as being contractual in nature.") Yet, at the same time, "[c]ontracts for private education have unique qualities and must be construed to allow the institution's governing body to meet its educational and doctrinal responsibilities." *Ray v. Wilmington Coll.*, 667 N.E.2d 39, 42 (Ohio Ct. App. 1995). Courts therefore will not interfere with a private university's right to make regulations, establish requirements, set scholastic standards, and enforce disciplinary rules absent "*a clear abuse of discretion*." *Schoppelrei v. Franklin Univ.*, 228 N.E.2d 334, 336 (Ohio Ct. App. 1967) (emphasis

added); *accord Wilmington Coll.*, 667 N.E.2d at 42; *see also State v. Adams*, 404 N.E.2d 144, 149 (Ohio 1980) ("The term 'abuse of discretion' connotes more than an error of law or of judgment; it implies that the [adjudicating body's] attitude is unreasonable, arbitrary[,] or unconscionable.").

B.      Breach of Contract

Valente alleges that, in conducting its disciplinary hearing, the Law School's Honor Council failed to abide by some of the Honor Code's terms, thus breaching the University's contract with him in two ways:  first, the Honor Council denied him the opportunity to impeach the prosecution's student-witnesses;  second, it misconstrued the Law School's "Quiet Period" rule, applying terms explained in a school-wide email from the Registrar, rather than an alternate, oral explanation that Dean Lori Shaw purportedly gave Valente.  Valente argues that either of these "errors" creates an issue of material fact as to whether Dayton breached the contract and thus precludes summary judgment.  We disagree.  Contrary to Valente's assertions, the issue here is *not* whether the Law School strictly adhered to each of the Honor Code's procedural rules, or whether it could have provided a better hearing, but rather whether it abused its discretion—whether it acted unreasonably, arbitrarily, or unconscionably.  *See Adams*, 404 N.E.2d at 149; *Wilmington Coll.*, 667 N.E.2d at 42.

Addressing Valente's first point, we note that, although the Honor Code does provide each party the right "to impeach any witness," the Honor Council President may nevertheless "limit the amount of relevant but marginally probative evidence."  Valente states that he wished to introduce details about the prosecutorial witnesses' own Honor Council hearings—evidence that, in addition

to receiving confidentiality protection under the Honor Code, offers little obvious probative value. Valente's first argument thus gives us no reason to conclude that the Honor Council violated Honor Code procedures, let alone that it abused its discretion.

We move to Valente's second contention, which involves the correct interpretation of UDSL's Quiet Period rule. Prior to the Fall 2007 exam period, the Law School's Registrar circulated an email to students, reminding them of UDSL's Quiet Period. As she explained, "AFTER you take [an] exam, you may not discuss the exam OR any legal concepts relating to the course with any member of the UDSL community . . . . If a discussion of [a] completed exam arises, you are to immediately remove yourself from the conversation." But according to Valente, Dean Shaw told him that students "were allowed to accept material from [other] students who had taken [an] exam," so long as "the student giving the material [did] not alter the material after taking the exam and a student [did] not accept any material he knew to have been altered" by another student after that student had taken the exam. He thus maintains that because he allegedly did not know that the questions he received were actual test questions (rather than hypothetical practice questions), he did not violate the Quiet Period rule, at least as he understood it.

The terms governing a student-university contract generally reside in the school's guidelines supplied to students, though the parties may alter these terms through mutual agreement. *Bleicher v. Univ. of Cincinnati Coll. of Med.*, 604 N.E.2d 783, 787 (Ohio Ct. App. 1992). But even if we assume that the purported exchange with Shaw occurred, we need not determine whether it displaced

the Registrar's official explanation of the Quiet Period rule, as Valente never raised the issue when given the opportunity to defend his actions during the disciplinary hearing. Instead, this "alternate interpretation" argument only surfaced months later, in Valente's district-court action. Valente essentially faults the Honor Council for overlooking exculpatory evidence—his supposed conversation with Dean Shaw—*evidence that he failed to present*. Based upon these facts, we discern no abuse of discretion in the Honor Council's disciplinary procedures or judgment.

We accordingly affirm the district court's grant of summary judgment on Valente's breach-of-contract claim.

C.      Breach of the Duty of Good Faith and Fair Dealing

Valente also alleges that the University's actions violated its duty of good faith and fair dealing. This contention has no merit because, excepting insurance contracts, *see, e.g.*, *Suver v. Pers. Serv. Ins. Co.*, 462 N.E.2d 415, 417 (Ohio 1984), "Ohio courts have been circumspect in allowing tort remedies for breaches of such duties," *In re Commercial Money Ctr., Inc., Equip. Lease Litig.*, 603 F. Supp. 2d 1095, 1122 (N.D. Ohio 2009). In fact, when addressing a contractual dispute between a school and its former employees and students, the Ohio Court of Appeals held that "[t]here is no separate tort cause of action for breach of good faith that is separate from a breach of contract claim." *Ne. Ohio Coll. of Massotherapy v. Burek*, 759 N.E.2d 869, 875 (Ohio Ct. App. 2001). Lacking sufficient grounds to form a separate cause of action, Valente's second claim thus fails.

D.      Promissory Estoppel

Valente next asserts that promissory estoppel should apply to Dean Shaw's alleged representations about the Quiet Period rule.   Though Valente's brief offers no explanation whatsoever for this argument, we construe his filings liberally because he proceeds pro se. *See, e.g.*, *Boswell v. Mayer*, 169 F.3d 384, 387 (6th Cir. 1999).  "Under Ohio's promissory estoppel doctrine, a promise that the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and . . . [that] does induce such action or forbearance is binding if one can avoid injustice only by enforcing the promise." *Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 503 (6th Cir. 2003) (alteration in original) (internal quotation marks and citation omitted).

Because Valente does not develop his argument, we can only guess as to how he believes this equitable principle should bear upon the instant action.  We presume that he wants the courts to enforce Dean Shaw's supposed interpretation of the Quiet Period rule, rather than that of the Registrar.  Yet even if we assume that Dean Shaw's statement qualifies as a "promise," we do not believe that "avoid[ing] injustice" mandates estoppel; as we discussed earlier, Valente had the opportunity to present this evidence to the Honor Council, but failed to do so.  And, as a broader matter, the presence of an enforceable contract between Dayton and Valente generally precludes promissory-estoppel claims relating to the contract. *See O'Neill v. Kemper Ins. Cos.*, 497 F.3d 578, 583 (6th Cir. 2007) ("In Ohio, [w]here the parties have an enforceable contract and merely dispute its terms, scope, or effect, one party cannot recover for promissory estoppel . . . ." (alteration in

original) (internal quotation marks and citation omitted)); *accord Telxon Corp. v. Smart Media of Del., Inc.*, Nos. 22098, 22099, 2005 WL 2292800, at *21 (Ohio Ct. App. Sept. 21, 2005). We thus affirm the district court's grant of summary judgment on Valente's promissory-estoppel claim.

E.      Tort Claims

In his original complaint, Valente alleged eight separate tort claims; he preserves four on appeal: breach of fiduciary duty, negligence, intentional infliction of emotional distress, and fraud. As a preliminary matter, "under Ohio law the existence of a contract action generally excludes the opportunity to present the same case as a tort claim." *Wolfe v. Cont'l Cas. Co.*, 647 F.2d 705, 710 (6th Cir. 1981). Because, as we explained, the relationship between a university and its students is contractual, *see Behrend*, 379 N.E.2d at 620, and all of Valente's claims arise from the same course of events (namely, his suspension from UDSL for Honor Code violations), we could dispose of his tort claims summarily. But, because these claims nonetheless fail on the merits, we address each one briefly.

1.      Breach of Fiduciary Duty

Valente alleges that in conducting its Honor Council hearing and suspending him, Dayton violated a fiduciary duty that it owed to him as a student. The elements for a breach-of-fiduciary-duty claim include the following: "(1) the existence of a duty arising from a fiduciary relationship; (2) a failure to observe the duty; and (3) an injury resulting proximately therefrom." *Wells Fargo*

*Bank, N.A. v. Sessley*, 935 N.E.2d 70, 83 (Ohio Ct. App.) (internal quotation marks and citation omitted), *appeal denied*, 935 N.E.2d 856 (Ohio 2010). Parties form a "fiduciary relationship" when "special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *In re Termination of Emp't of Pratt*, 321 N.E.2d 603, 609 (Ohio 1974).

Although the "fiduciary relationship" definition is somewhat vague, our search of Ohio case law yields no instances where courts have applied it to the university-student context. We find this observation telling, especially because Ohio "courts have been reluctant to characterize relationships between individuals as being fiduciary in nature, with the obvious exception of those relationships that involve statutorily-imposed duties." *Casey v. Reidy*, 906 N.E.2d 1139, 1145 (Ohio Ct. App. 2009) (collecting cases). Valente, in support of his argument, cites only one decision—from New Hampshire—which held that "*[i]n the context of sexual harassment by faculty members*, the relationship between a post-secondary institution and its students is a fiduciary one," because the power differential between students and faculty makes it difficult for students to refuse professors' unwelcome advances. *Schneider v. Plymouth State Coll.*, 744 A.2d 101, 105 (N.H. 1999) (emphasis added). Yet this case offers no insight into Valente's claim, given its limited holding and obvious factual differences. Recognizing the Ohio courts' hesitancy to impose fiduciary duties outside their traditional contexts, we accordingly see no reason to extend them now.

2.      Negligence

Next, Valente argues that Dayton failed to train or supervise its employees and agents, thereby giving rise to a negligence claim. "To establish actionable negligence, one must show in addition to the existence of a duty, a breach of that duty and injury resulting proximately therefrom." *Mussivand v. David*, 544 N.E.2d 265, 270 (Ohio 1989). But "an action of tort for negligence cannot be maintained unless the defendant's conduct constituted the breach of a duty imposed by law, *apart from it being a breach of an obligation created by agreement of the parties*, either express or implied." *Bowman v. Goldsmith Bros. Co.*, 109 N.E.2d 556, 557 (Ohio Ct. App. 1952) (emphasis added); *accord Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261, 1270 (Ohio Ct. App. 1996).

In support of his negligence action, Valente recites a litany of duties that Dayton supposedly breached. Yet these obligations all arise from Dayton's Honor Code (one of the sources of terms governing the student-university contract, *see Bleicher*, 604 N.E.2d at 787–88) and mirror the duties that Valente lists in his breach-of-contract claim. Because the duties Valente identifies all arise from his contractual relationship with Dayton, he proffers no grounds upon which to base a negligence action.

3.      Intentional Infliction of Emotional Distress

In his penultimate tort claim, Valente accuses the University of intentionally inflicting emotional distress.  In Ohio, a plaintiff claiming intentional infliction of emotional distress must show the following:  (1) the defendant intended to cause plaintiff's emotional distress or should have known that such serious emotional distress would result, (2) the defendant's conduct was outrageous, extreme, beyond all possible bounds of decency, and utterly intolerable in a civilized community, (3) the defendant's conduct proximately caused the plaintiff's psychic injury, and (4) the plaintiff's emotional distress was so serious that no reasonable person could be expected to endure it.  *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1110 (6th Cir. 2008).

The most obvious reason to reject Valente's emotional-distress claim is that he makes no showing that the University engaged in extreme and outrageous conduct.  Quite the contrary, we view Dayton's stringent enforcement of its academic standards proper, if not commendable.  We accordingly affirm the district court's grant of summary judgment to Dayton on this claim.

4.      Fraud

Finally, Valente argues that Dean Shaw, in offering her purported "alternate explanation" of the Law School's Quiet Period rule, intentionally defrauded him.  The elements of a fraud claim are (1) a misrepresentation of a material fact; (2) made with knowledge of its falsity, or with such utter disregard as to its truth that knowledge may be inferred; (3) with the intent to induce another's

reliance on it; (4) justifiable reliance upon the representation or concealment; and (5) a resulting injury proximately caused by the reliance. *Burr v. Bd. of Cnty. Comm'rs*, 491 N.E.2d 1101, 1105 (Ohio 1986).

Although Valente's filings provide several cursory allegations, he offers no facts demonstrating that Dean Shaw knew her statements were false, or that she acted with the intent to deceive. *See Schwartz v. Bank One, Portsmouth, N.A.*, 619 N.E.2d 10, 12 (Ohio Ct. App. 1992) ("[A] cause of action cannot be classified a tort action simply because the appellant used the term 'fraudulently' in [the] pleading."). Lacking a showing of scienter, Valente's fraud claim fails.

III.

For these reasons, we affirm the district court's decision granting summary judgment to the University on all claims.