[Cite as *Mohler v. Univ. of Toledo Athletic Dept.*, 2025-Ohio-518.]

**IN THE COURT OF CLAIMS OF OHIO**

| | |
|---|---|
| CAITLIN MOHLER<br><br>　　　Plaintiff<br><br>　　　v.<br><br>UNIVERSITY OF TOLEDO ATHLETIC DEPT<br><br>　　　Defendant | Case No. 2023-00630JD<br><br>Judge Lisa L. Sadler<br>Magistrate Holly True Shaver<br><br><u>DECISION</u> |

{¶1} Plaintiff, Caitlin Mohler, an undergraduate student at the University of Toledo, brings this action against Defendant, University of Toledo Athletic Department ("UT"), for UT's decision to remove Plaintiff from its women's soccer program. Plaintiff brings claims for negligent misrepresentation, promissory estoppel, and negligence.

{¶2} On October 18, 2024, Defendant filed a Motion for Summary Judgment pursuant to Civ.R. 56(B). With leave of Court, on December 2, 2024, Plaintiff filed a memorandum in opposition. Defendant filed a reply on December 9, 2024, and a Notice of Supplemental Authority on December 30, 2024. Pursuant to L.C.C.R. 4(D), the Motion for Summary Judgment is now fully briefed and is before the Court for a non-oral hearing. For the reasons stated below, the Court GRANTS Defendant's Motion for Summary Judgment.

**Standard of Review**

{¶3} Motions for summary judgment are reviewed under the standard set forth in Civ.R. 56(C), which states, in part:

> Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law.

No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor.

{¶4} "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record before the trial court which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996).

{¶5} To meet this initial burden, the moving party must be able to point to evidentiary materials of the type listed in Civ.R. 56(C). *Id*. at 292-293. If the moving party meets its initial burden, the nonmoving party bears a reciprocal burden outlined in Civ.R. 56(E), which provides that "an adverse party may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."

{¶6} "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also*, *Perez v. Scripps-Howard Broadcasting Co.*, 35 Ohio St.3d 215, 218-219 (1988). When considering the evidence, "[a]ny doubt must be resolved in favor of the non-moving party." *Pingue v. Hyslop*, 2002-Ohio-2879, ¶ 15 (10th Dist.). It is well-established that granting summary judgment is not appropriate unless, construing the evidence most strongly in favor of the nonmoving party: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, that conclusion being adverse to the nonmoving party. *Robinette v. Orthopedics, Inc.*, 1999 Ohio App. LEXIS 2038, 7 (10th Dist. May 4, 1999).

**Factual Background**

{¶7} In 2020, the coaching staff of UT's women's soccer program began recruiting Plaintiff to play on the women's soccer team as a goalkeeper. (Complaint, ¶ 10). Former goalie coach, Coach Nei, and head coach, Coach Thomas "TJ" Buchholz, spoke with Plaintiff throughout the recruitment season, while Plaintiff was in high school. Mohler Deposition, 13:18-16:13; 23:3-22. On July 27, 2020, Coach Buchholz began texting Plaintiff regarding her recruitment. *Id.* at 23:10-21. On October 11, 2020, Plaintiff was verbally offered an athletic and academic scholarship valued at $72,753.00 over four years to play for UT's soccer program as a goalkeeper starting in the Fall 2022 academic year during a conversation via Zoom with Plaintiff, her mother, and Coach Buchholz. (Complaint, ¶ 11); *see also* Mohler Deposition, 24:12-27:19; Mohler Deposition Exhibit I.[1] Two days later, Mohler accepted the scholarship package and agreed to play for UT's women's soccer program. (Complaint, ¶ 12).

{¶8} A year later, in November 2021,[2] Plaintiff's high school held an early "signing day." Mohler Deposition, 40:14-43:14; *see also* Mohler Deposition, Exhibit B. Signing day was a ceremony conducted by Plaintiff's high school where prospective student-athletes would sign ceremonial National Letters of Intent ("NLI") or similar items to demonstrate what programs they would be joining. *Id.* Plaintiff asked UT for something to sign during the signing ceremony and was provided a qualified letter of commitment, with instructions on how and when to sign. (Complaint, ¶ 15); Mohler Deposition, 41:21-42:2; *see also* Mohler Deposition, Exhibit B. The letter states:

> TO BE SIGNED WEDNESDAY, NOVEMBER 10th, AFTER 7:00am
> On this 10th of November 2021, I, Caitlin Mohler, do hereby accept a qualified letter of commitment to the University of Toledo and the Women's Soccer Program for the Spring Semester of 2022. There is also an understanding that:

---

[1] Plaintiff submitted a photograph of notes she took during the conversation. Mohler Deposition Exhibit I. Those amounts total $72,703.00.

[2] Plaintiff states that the early signing event occurred on November 14, 2021. Mohler Deposition, 41:7-14. However, the signed letter of commitment states that the letter was to be signed on November 10, after 7:00 a.m. Additionally, Plaintiff's, Plaintiff's parent's, and Coach Buchholz's signatures are all dated November 8, 2021. Mohler Deposition, Exhibit B.

- In order to compete during my first year of enrollment, I must be deemed eligible by the NCAA Initial Eligibility Center

- I must be accepted for admission by The University of Toledo.

Upon receipt of this letter and upon receipt of my University of Toledo enrollment deposit, I am giving my full commitment to attend The University of Toledo in the Spring Semester of 2022.

Mohler Deposition, Exhibit B.

{¶9} After completion of the letter of commitment, Mohler was added to the UT women's soccer webpage, announcing her as a newly signed member of the 2022 recruiting class. (Complaint, ¶ 16). Plaintiff received no scholarship documents at this time, as Mohler's potential scholarship would not begin until Fall 2022. Schank Affidavit, ¶ 11-13.

{¶10} During Plaintiff's recruitment, Coach Buchholz told her that she would be "up for time" if she attended UT a semester early to get established and integrate with the team. Mohler Deposition, 16:12-22. Plaintiff stated that "up for time" meant that she "would be considered for playing time if I came early, and I would be further along in my part with the team. So I would come early and I would be established with the team, and I would be more likely to get playing time the upcoming fall season prior to the other recruits in my class coming." *Id.* To increase her chances of playing as a freshman, Plaintiff chose to graduate high school early and began attending UT in January 2022, for the Spring 2022 semester. (Complaint, ¶ 13); Mohler Deposition, 18:13-17. Any scholarship discussed verbally with Coach Buchholz would not begin until the Fall 2022 semester, with scholarship paperwork to be provided and signed for on July 1, 2022. Schank Affidavit, ¶ 11-13; Mohler Deposition, 24:18-27:19, 44:2-6. Plaintiff did not receive or sign any documents related to her academic and athletic scholarship during the Spring 2022 semester.[3] *Id.* Plaintiff was aware in January 2022 that any potential

---

[3] Plaintiff testified that her athletic scholarship would not begin until Fall 2022. Mohler Deposition, 27:17-19. However, Plaintiff also testified that she received a "top scholar" academic scholarship that started in Spring 2022, that Coach Buchholz was not aware of. *Id.*, p. 29:13-21.

athletic scholarship would be reviewed every subsequent year. Mohler Deposition, 37:1-5.

{¶11} Plaintiff suffered from chronic knee problems starting when she was eleven years old. Mohler Deposition, 44:12-46:13. Before Mohler started high school she began wearing braces for her knees. *Id.* at 45:23-46:13. As a requirement for participation in college athletics, the National College Athletic Association ("NCAA") requires that student-athletes undergo a pre-participation physical examination. (Complaint, ¶ 18). Plaintiff was examined by the team physician who discovered Mohler's pre-existing underlying knee injuries. *Id.* at ¶ 19-20. UT's team physician diagnosed Plaintiff with recurrent patella subluxation.[4] Mohler Deposition, 46:22-24. The team physician recommended surgery to correct the patella subluxation. (Complaint, ¶ 19). The team physician informed Plaintiff that she would not be cleared to play soccer unless she underwent the surgery. *Id.* at ¶ 20. Coach Buchholz informed Plaintiff that so long as there was a viable road to recovery she would retain her scholarship and place on the team. (Complaint, ¶ 21); *see also* Mohler Deposition, 27:17-23.

{¶12} On March 24, 2022, Plaintiff underwent surgery to repair her right knee. *Id.*, Exhibit L2. Plaintiff asserts that the operation has cost her $112,702.22 in medical bills. (Complaint, ¶ 22). Additionally, Plaintiff asserts that she has incurred $37,476.00 in bills in connection with physical therapy and recovery. *Id.* at ¶ 59. Plaintiff stated that she was covered by her mother's insurance during surgery and physical therapy.[5] Mohler Deposition, 55:4-57:21; *see also* Mohler Deposition, Exhibit L-1, L-2.

{¶13} Following her surgery, Plaintiff was only able to attend team practices and was unable to physically participate. (Complaint, ¶ 23). During Plaintiff's recovery, Coach Jae Cunningham, Plaintiff's new goalie coach, began to reduce and/or cancel Plaintiff's

---

[4] The patella (kneecap) attaches to the femur and tibia by tendons. The patella fits into a groove at the end of the femur and slides up and down as the knee bends and straightens. Patellar instability occurs when the kneecap moves outside of this groove. Chronic patellar instability occurs when the kneecap only slides partly out of the groove, known as a subluxation. Johns Hopkins Medicine, *Patellar Instability*, https://www.hopkinsmedicine.org/health/conditions-and-diseases/patellar-instability (Accessed Jan. 9, 2025).

[5] After insurance coverage, Plaintiff's bills show Plaintiff owed, at least, $2,407.16. Mohler Deposition, Exhibits L-1, L-2.

one-on-one meetings. Mohler Deposition, 72:3-9. According to Plaintiff, during one-on-one meetings with Coach Cunningham, Plaintiff was belittled, embarrassed, and harassed. (Complaint, ¶ 24). Plaintiff felt that Coach Cunningham's actions were personal against her, not simply ordinary coaching tactics. Mohler Deposition, 66:13-67:5. Coach Cunningham's confrontations continued throughout Plaintiff's entire relationship with UT's soccer program. (Complaint, ¶ 27).

{¶14} On April 21, 2022, Coach Cunningham asked Plaintiff to meet with her in her office after practice. *Id.* at ¶ 25. Plaintiff states that in the closed-door meeting Coach Cunningham yelled, slammed her fists together, and "degraded" Plaintiff. *Id.* Coach Cunningham told Plaintiff that she was "the type of player I don't want on this team," that she "had no friends on the team," and that Plaintiff would need "to come back a different person." *Id.* On April 22, 2022, Plaintiff spoke with her athletic trainer to discuss Coach Cunningham's treatment of her. *Id.* at ¶ 27.

{¶15} On April 24, 2022, Plaintiff attended an off-campus team party hosted by the UT women's soccer team captains. Mohler Deposition, 89:13-90:2. Plaintiff drank alcohol and played drinking games with the rest of the UT soccer team. *Id.* at 90:11-91:12; *Id.*, Exhibit K-109 through Exhibit K-112. During the party, Plaintiff opened up to two members of the team regarding her experiences with Coach Cunningham. (Complaint, ¶ 27); Mohler Deposition, 99:2-100:4. Plaintiff described to her teammates what Coach Cunningham had said to her in the one-on-one meetings and her general attitude and demeanor towards Plaintiff. *Id.* At some point during the party, Plaintiff stated:

> I understand how NCAA athletes -- I don't know if you guys have seen, there were many deaths including the Stanford goalie, Katie, who was the goalkeeper who killed herself around the same time that this party and all of my coaches stuff was going on, so I was saying I understand how this happens.

Mohler Deposition, 103:15-21. After making these comments, Plaintiff left the party with a friend who was not on the soccer team and retired for the night. *Id.* at 102:3-19. Out of concern regarding what Plaintiff had shared and her safety, one of Plaintiff's teammates notified UT's coaches regarding Plaintiff's comments and her current physical/mental

condition. (Complaint, ¶ 27); Mohler Deposition, 100:8-14. That evening Coach Buchholz called Plaintiff to make sure she was okay and had made it home safely. Mohler Deposition, 105:22-106:3.

{¶16} Plaintiff was scheduled to meet with Coach Buchholz on April 25, 2022 for a previously scheduled meeting. Mohler Deposition, 108:11-20. Plaintiff approached Coach Buchholz prior to the meeting to apologize for the prior night. *Id.* Coach Buchholz instructed Plaintiff to provide a list of missteps she made in the situation for their meeting later. *Id.*, at 108:20-109:7. Plaintiff wrote a letter in which she stated what had transpired and apologized for it, which Coach Buchholz copied. *Id.* at 109:16-110:19. Plaintiff was instructed to go across the hall to Coach Cunningham's office to speak with her alone. *Id.* at 112:8-13.

{¶17} Coach Cunningham told Plaintiff that Plaintiff was "going to go in front of the entire team and you're going to say that you lied and that this did not happen and that [Coach Cunningham] did not say those things." *Id.* at 114:13-16. Multiple follow up meetings occurred in which Plaintiff was continually subjected to "yelling, belittling, aggressive movements, and abusive language". (Complaint, ¶ 28). As a result of these meetings, Coach Buchholz gave Plaintiff an ultimatum: repair her relationship with Coach Cunningham by going before the team, and the rest of the coaching staff, and apologize for what she had said about Coach Cunningham, or be removed from the team. (Complaint, ¶ 29-30); Mohler Deposition, 113:10-16. Plaintiff stated "I'm not going to go in front of the team, I did not lie." (Complaint, ¶ 30); Mohler Deposition, 114:20-21.

{¶18} On May 4, 2022, Plaintiff and Plaintiff's father met with Coach Buchholz and Coach Cunningham. Plaintiff recorded the meeting without the coaches' knowledge. *Id.* at ¶ 31; DeMarco Affidavit, Exhibit A.[6] The purpose of the meeting was to find a path forward, because Coach Cunningham disputed Plaintiff's version of events during the previous meetings and there was a rift that Plaintiff's accusations had caused throughout the team. DeMarco Affidavit, Exhibit A. In the meeting, Plaintiff was informed again of the requirements for her to stay in UT's soccer program: apologize before the team and

---

[6] Defendant submitted a copy of the audio recording of this meeting, which was produced by Plaintiff in discovery. DeMarco Affidavit, Exhibit A.

coaching staff regarding what she had said about Coach Cunningham at the April 24, 2022 party.  DeMarco Affidavit, Exhibit A.  Plaintiff asked for additional time to figure out what she would do.  *Id.*; *see also* DeMarco Affidavit, Exhibit B.

{¶19} On May 27, 2022, Coach Buchholz emailed Plaintiff stating "[a]t this point, we need to know by **Wednesday, June 1ˢᵗ** if you are going to positively resolve your situation within the program. If not, we will need to release you from the team." (Emphasis in original) DeMarco Affidavit, Exhibit B.  On May 31, 2022, Plaintiff responded to Coach Buchholz's email seeking additional clarification on what specifically she had done wrong and alternative "positive" resolutions she may have that did not involve her appearing before the team to apologize.  DeMarco Affidavit, Exhibit C.  On June 3, 2022, Coach Buchholz informed Plaintiff that because she was "unwilling to do what was fully needed to resolve this situation, we have decided to release you from the soccer team."  DeMarco Affidavit, Exhibit D.  On June 3, 2022, Coach Buchholz submitted the roster deletion paperwork notifying the office of athletic compliance of Plaintiff's dismissal from the soccer team.  Schank Affidavit, ¶ 9.

{¶20} Plaintiff's removal from the UT soccer program resulted in Plaintiff not receiving the academic and athletic scholarship for Fall 2022.  (Complaint, ¶ 32).  Plaintiff was unable to utilize the NCAA transfer portal, and could not appeal her removal from the team or her scholarship revocation as she had not signed an NLI or any scholarship paperwork at the time of her removal.  *Id.* at ¶ 35-36; Schank Affidavit, ¶ 12-16.

**Law and Analysis**

{¶21} Defendant argues that UT is immune from liability for any decisions made regarding athletic team rosters as they are discretionary decisions.  Additionally, Defendant argues that Plaintiff's claims for negligent misrepresentation, promissory estoppel, and negligence fail because Plaintiff cannot state a prima facie case for any of her claims.

**Discretionary Immunity**

{¶22} "The doctrine of discretionary immunity provides that 'the state cannot be sued for its legislative or judicial functions or the exercise of an executive or planning

function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion.'" *Cristino v. Ohio Bur. of Workers' Comp.*, 2012-Ohio-4420, ¶ 22 (10th Dist.), quoting *Reynolds v. State,* 14 Ohio St.3d 68, 70 (1984). "Therefore, the Court of Claims does not have jurisdiction when the state makes highly discretionary decisions pursuant to its legislative, judicial, executive, or planning functions, because the state has not waived its sovereign immunity for those decisions." *Smith v. Ohio State Univ.*, 2024-Ohio-764, ¶ 16. "It is important to note that discretionary immunity is not absolute. Once a discretionary decision has been made to engage in a certain activity, 'the state may be held liable, in the same manner as private parties, for the negligence of the actions of its employees and agents in the performance of such activities.'" *Id.* at ¶ 17, quoting *Reynolds* at paragraph one of the syllabus. "This means that when a suit challenges the manner in which the state implements one of its discretionary decisions, the Court of Claims will not be barred from hearing the case." *Id.* at ¶ 17.

{¶23} While addressing immunity in relation to political subdivisions, the Tenth District Court of Appeals has held that discretionary immunity applies to "an athletic coach's discretionary policy making, planning, and enforcement powers with respect to activities associated with the athletic program." *Michael v. Worthington Ohio City Sch. Dist.*, 2020-Ohio-1134, ¶ 24 (10th Dist.). *See also, Pope v. Trotwood-Madison City School Dist. Bd. of Edn.*, 2004-Ohio-1314 (2nd Dist.) (the coach participating and supervising the open gym basketball games was within his discretion); *Starkey v. Hartzler*, 1997 Ohio App. LEXIS 1177 (9th Dist. Mar. 26, 1997) (middle school football coach's method of discipline was within his discretion).

{¶24} Here, Defendant argues that coaches have the authority and discretion to select, retain, or dismiss players from the team. (Motion for Summary Judgment, p. 6-7). Additionally, Defendant argues that coaches have the authority and discretion to determine the conduct required of players to remain on the team. *Id.*

{¶25} In support of its Motion, UT submitted an affidavit from Kenneth Schank, the Associate Athletic Director for Compliance at UT. Schank avers, in part:

6.       Caitlin Mohler enrolled at UT in the spring semester of 2022.

7.    Mohler was not on an athletic scholarship at that time and was essentially a walk-on student-athlete. The phrase "walk-on" generally refers to student-athletes who are not receiving an athletic scholarship.

8.    Mohler did not sign a national letter of intent during her senior year of high school.

9.    The head women's soccer coach TJ Buchholz submitted official roster deletion paperwork notifying the office of athletic compliance of her dismissal from the women's soccer team on June 3, 2022.

10.    The head women's soccer coach at the time, TJ Buchholz, had the authority to determine who was on the soccer team and to dismiss her from the team.

11.    If Mohler would have stayed on the team, the head women's soccer coach had the discretion to put her on an athletic scholarship in the fall of 2022. A coach who wants to put a student-athlete on an athletic scholarship has to notify the athletics scholarship coordinator to write and issue an athletic scholarship agreement to a student-athlete. The student-athlete would then sign it, and the formal signed paperwork is then filed with the athletic business office and the office of financial aid. To my knowledge, Coach Buchholz never submitted such a request to our athletic scholarship coordinator.

12.    Upon her dismissal from the team in June 2022, Mohler had never signed an athletic scholarship agreement, nor was an athletic scholarship offer submitted to the athletic scholarship coordinator to issue to the student. Mohler was never on an athletic scholarship while she was a member of the women's soccer team.

13.    Since Mohler never signed a national letter of intent during her senior year of high school, she was not receiving an athletic scholarship for the Spring 2022 academic term, nor subsequent academic terms.

14.    As a walk-on (non-athletic scholarship) student-athlete, Mohler signed a letter of commitment in November of 2021. The head women's soccer coach never authorized for a national letter of intent to be issued to

Mohler. Mohler signed a letter of commitment to essentially be a welcomed part of the Toledo women's soccer team.

15. A generic letter of commitment document is ceremonial in nature, and they are occasionally sent so that a walk-on (non-athletic scholarship student) has something to sign on national letter of intent signing day. Some incoming walk-on students even sign blank papers on signing day so they can participate in high school wide ceremonial functions attended by fellow high school students, high school teammates, high school coaches, high school staff, and parents.

16. A student on an athletic scholarship has a right to appeal the revocation of said scholarship. Here Mohler had no right to appeal since she was not on an athletic scholarship since she came as a non-athletic scholarship student-athlete (walk-on). The letter of commitment she signed as a ceremonial document would not have conferred appeal rights on Mohler since she was not on an athletic scholarship when she was dismissed.

Schank Affidavit, ¶ 6-16.

{¶26} In his deposition, Schank elaborates on his affidavit stating:

Q. So is there a policy regarding an appeal of being dismissed from the team, then, for walk-ons since they're not going to be receiving financial aid?

A. No. So those are two mutually exclusive areas there. So, one, if you're just on the team, coaches have the authority to add and delete individuals as they see fit. . . . but if that person was receiving an athletic scholarship, now you just invoked a hearing opportunity for that individual to potentially appeal that opportunity if they chose to stay at the University.

Q. . . . you said that the coach has discretion to add or delete or remove student-athletes from their team. Is there any policy that UT has related to that process or is it whatever the coach says?

A. It's the coach's discretion.

Q. So the student-athlete has no right to challenge that decision?

A. Correct.

Q. Does NCAA have any policies related to challenging the dismissal or removal of a student-athlete from their team?

A. From a roster standpoint, no. The stipulation that's noted here, if they're on an athletic scholarship, you know, that's the binding promise that's given to the student-athlete, that they have the opportunity to appeal that for their athletic scholarship only, not for their roster spot.

Q. If a coach is going to dismiss someone from their team, do they have to reach out to compliance?

A. I mean, they can if they have questions prior to, but otherwise they're not required to. They just have to submit procedurally a roster deletion form to our office notifying us the date of which they removed a student-athlete from their team.

Schank Deposition, 65:8-67:4.

{¶27} In response, Plaintiff states that she is not arguing against UT's decision to remove her from the team, rather the manner in which it did so. (Plaintiff's Response in Opposition, p. 7-8). Mohler asserts that "Defendant's actions were not a legitimate exercise of discretion, but were implemented in a retaliatory manner and were aimed at punishing Plaintiff for reasons unrelated to her athletic performance. Because evidence demonstrates that the dismissal was punitive, motivated by hostility, and unrelated to team performance or composition, discretionary immunity does not protect UT from liability." *Id.* at p. 8.

{¶28} Construing the evidence most strongly in Plaintiff's favor, reasonable minds can conclude only that Coach Buchholz used his discretion as head coach to remove Plaintiff from the team roster. It is undisputed that Plaintiff had an ongoing conflict with Coach Cunningham, and after a series of meetings, Plaintiff was notified that she had to repair her relationship with Coach Cunningham and her teammates to stay on the team. Mohler Deposition, 113:10-16; 117:22-24. The emails produced by Defendant show that Plaintiff was provided additional time to apologize to Coach Cunningham and her teammates, and Plaintiff chose not to apologize because she interpreted it as compromising her integrity. *Id.* at 116:6-16. Coach Buchholz decided that if Plaintiff could

not repair her relationship with Coach Cunningham and her teammates, Plaintiff was no longer welcome on the team. *Id.* at 117:22-24. While the underlying facts of what Coach Cunningham said and what Plaintiff said may be different, those factual issues are not material to deciding whether Defendant is entitled to discretionary immunity. Plaintiff points to no evidence to rebut Schank's affidavit and deposition testimony that Coach Buchholz had the discretion to remove her from the team because she was a walk-on athlete prior to Fall 2022, and any athletic scholarship she was entitled to would not have started until that time. Ultimately, Plaintiff's argument is not about the manner in which she was removed from the team, but her removal altogether as she lost her potential Fall 2022 scholarship opportunity. *See* (Complaint, ¶ 45, 52, 59, 75). Accordingly, Plaintiff's contention that she is arguing against the manner in which she was removed from the team, not her removal, is unpersuasive, and the only reasonable conclusion is that Defendant is entitled to discretionary immunity for the decision to remove her from the team.

**Negligent Misrepresentation**

{¶29} Plaintiff argues in her negligent misrepresentation claim that Defendant represented to her that she would receive a scholarship package of $72,753.00 to attend UT and be a member of the women's soccer team; that Defendant provided her with an NLI and she relied on the contents of the NLI to commit to UT as a student-athlete; that as a direct result of Defendant's false statements, Plaintiff has incurred damages in the amount of the scholarship; that she would not have committed to UT if she had known that the "ceremonial NLI" was not a "real" NLI; that her appeal rights were denied; that she was subjected to unnecessary knee surgery; that Coach Buchholz represented to Plaintiff that her scholarship would remain intact as long as there was a viable road for recovery after knee surgery; and that she has incurred medical expenses and physical therapy expenses when she was wrongfully removed from the team. (Complaint, ¶ 37-54).

{¶30} Defendant states that Plaintiff never signed an NLI and because Plaintiff was not on scholarship at the time of her dismissal, no appeal opportunities were lost as none were available to her. (Motion for Summary Judgment, p. 11-12). Additionally, Defendant

argues that at no time was Plaintiff led to believe that she would retain her scholarship regardless of her behavior so long as she had a viable path to recovery. *Id.* In response, Plaintiff argues that she was misled about the nature of the document she signed and its implications for her scholarship and team membership. (Plaintiff's Response in Opposition, p. 12-13).

{¶31} "The elements of negligent misrepresentation are: '1) one who, in the course of his or her business, profession or employment, or in any other transaction in which he or she has a pecuniary interest, 2) supplies false information for the guidance of others in their business transactions, 3) is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, 4) if he or she fails to exercise reasonable care or competence in obtaining or communicating the information.'" *Patel v. Univ. of Toledo*, 2017-Ohio-7132, ¶ 30 (10th Dist.), quoting *Federated Mgt. Co. v. Coopers & Lybrand*, 137 Ohio App.3d 366, 395 (10th Dist. 2000).

{¶32} Plaintiff, throughout her pleadings, refers to the document she signed on signing day as an NLI. (Complaint, ¶ 15); Mohler Deposition, 40:14-42:5; *see also* Mohler Deposition, Exhibit B. Plaintiff acknowledged that in order to participate in her high school's signing day she requested something to sign from UT. *Id.* In response, UT sent Plaintiff a document which, on its face, is noted as a qualified letter of commitment. Mohler Deposition, Exhibit B.

{¶33} In his deposition, Schank describes in detail the difference between a NLI and a letter of commitment. Schank states that a

> national letter of intent is a binding document of which has to accompany an athletic scholarship being offered . . . a national letter of intent is governed by the NCAA . . . the national letter of intent document in and of itself is a standard template that an NCAA institution has to basically authorize, download directly from their NLI portal, and so that makes it very uniform in nature. There's no institutional logos on a valid national letter of intent document itself . . . If a student-athlete signed a national letter of intent, it has to display the terms and conditions of any athletic aid being offered to the prospective student.

Schank Deposition, 79:16-84:7. Schank goes on to describe the difference between an NLI and the document Plaintiff signed stating that Plaintiff signed

> [j]ust a ceremonial letter, a document that was issued to [Plaintiff] regarding signing something that basically had a university logo welcoming her to a member of the team as a walk-on . . . the coach was just giving her this document to be a part of a ceremonial -- probably, if I had to guess, maybe at her high school the sign -- on signing day with those that may be classmates that were offered national letter of intents for the sports and colleges at which they're looking to enroll.

*Id.* at 81:7-11, 82:18-24. Plaintiff does not present any evidence to rebut Schank's affidavit and deposition; nor does the document signed by Plaintiff resemble the characteristics of a binding NLI from the NCAA.

{¶34} Construing the evidence most strongly in favor of Plaintiff, the Court finds that reasonable minds can conclude only that Plaintiff has failed to satisfy the elements of a claim for negligent misrepresentation. Notably, Plaintiff fails to demonstrate that Defendant supplied false information to her that the document she signed was an NLI. The document signed by Plaintiff does not state that it is an NLI, nor does it contain any of the identifiers of such a document. Schank Deposition, 79:16-84:7; Mohler Deposition, Exhibit B. Plaintiff signed a Qualified Letter of Commitment. The document signed by Plaintiff, her parent, and Coach Buchholz states: "On this 10th of November 2021, I, Caitlin Mohler, do hereby accept a *qualified letter of commitment* to the University of Toledo and the Women's Soccer Program for the Spring Semester of 2022." (Emphasis added) Mohler Deposition, Exhibit B. In contrast, an NLI is a legal contract governed by the NCAA and requires a stringent format with the scholarship's terms and conditions included. The document signed by Plaintiff included the university letterhead and emblem and was not on the required NCAA form. Additionally, the document did not include any terms or conditions of the verbal scholarship discussed as would be required of a binding NLI. Even construing the evidence most strongly in favor of Plaintiff, the only reasonable conclusion is that Plaintiff did not sign an NLI, as alleged in paragraph 15 of her Complaint. As such, Plaintiff was not entitled to any appeal rights about her removal

which would have been available to her if she had signed an NLI.   Therefore, Plaintiff's claim of negligent misrepresentation fails on this basis.

{¶35} Next, Plaintiff argues that UT negligently misrepresented to her that she would retain her athletic scholarship so long as she had a viable path to recovery after her knee surgery.  (Complaint, ¶ 48-50).  Plaintiff's argument is without merit.  To start, Plaintiff does not present any evidence that Coach Buchholz's statements were false.  "A negligent misrepresentation does not lie for omissions; there must be some affirmative false statement." (Internal citations removed) *Jones v. Carpenter*, 2019-Ohio-619, ¶ 55 (10th  Dist.), quoting *Manno v. St. Felicitas Elementary School*, 2005-Ohio-3132, ¶ 34 (8th Dist.).   Coach Buchholz's statement that Plaintiff would maintain her athletic scholarship as long as she had a viable path to recovery is consistent with UT's policies and NCAA requirements.  Defendant's Handbook states,

> **5. Medical Disqualification**
>
> The University of Toledo Sports Medicine Staff and Team Physicians reserve the right to Medically Disqualify a student athlete under NCAA rules.  If it has been medically determined that it is unsafe or detrimental to their long-term  health  of  a  student  athlete  to  continue  participation  in Intercollegiate Athletics, the Head Team Physician has ultimate authority to Medically Disqualify a student athlete from participation.

(Emphasis in original) Mohler Deposition, Exhibit A, p. 41.

{¶36} It is uncontested that to participate in UT's women's soccer program Plaintiff would need clearance from the team physician.  (Complaint, ¶ 18).  Plaintiff's argument that she would have sought additional doctors' opinions and pursued less invasive treatments is immaterial.  *See Id.* at ¶ 58.  The team physician did not clear Plaintiff to play due to her underlying knee injury, which required knee surgery.  *Id.* at ¶ 20.  Coach Buchholz's statements that so long as Plaintiff had a viable path to recovery she would retain her athletic scholarship eligibility were truthful and consistent with the Handbook at the time they were made.  These truthful statements do not support a claim for negligent misrepresentation.

{¶37} Yet, that is not Plaintiff's argument.   Plaintiff's argument is that Coach Buchholz made a different promise; Plaintiff would only be removed from the team and

lose her athletic scholarship if she could not physically recover. *Id.* at ¶ 49, 52. Insofar as Plaintiff makes such an argument it is unpersuasive. Coach Buchholz never stated or implied to Plaintiff that the only way Plaintiff would be removed from the team is if she could not physically recover. Any interpretation as such by Plaintiff would be unreasonable. Coach Buchholz's statements merely conformed with UT policies regarding NCAA clearance requirements. Regardless of Plaintiff's clearance status, Plaintiff was still required to maintain additional requirements related to her conduct to remain on the team, failed to do so, and was removed. (Motion for Summary Judgment, p. 6-7). Plaintiff even acknowledged this, stating that she was not removed from the team because of her injury or recovery. Mohler Deposition, 131:5-6; DeMarco Affidavit, Exhibit D. Plaintiff's subsequent conflicts with coaching staff and removal has no bearing on her reliance on Coach Buchholz's statements; because, as with all other team members, Plaintiff was required to adhere to a code of conduct and Handbook requirements to maintain her spot on the team. *Id.*; *see also* Mohler Deposition, Exhibit A, p. 43.

{¶38} Reasonable minds can conclude only that after repeated meetings with Coach Buchholz on how to positively resolve the relationship with Coach Cunningham, and after receiving an email notifying Plaintiff that she would be released from the team if she did not positively resolve the situation, any justified reliance in an earlier representation that Plaintiff could lose her eligibility for an athletic scholarship only if she did not recover from surgery would not be reasonable. Indeed, Plaintiff was removed from the team, in her words, because she "chose not to call [herself] a liar," when she did not apologize to the team. Mohler Deposition, 131:5-6; DeMarco Affidavit, Exhibit D. Any such representation that she could lose her eligibility for an athletic scholarship only if she did not recover from surgery would have been modified by the emails that Coach Buchholz sent to Plaintiff in May and June 2022. *See* DeMarco Affidavit, Exhibits B and D.

{¶39} Accordingly, Plaintiff fails to satisfy the second prong of negligent misrepresentation, that she justifiably relied on any representation that she would lose her athletic scholarship for Fall 2022 only if she did not recover from knee surgery. Therefore, reasonable minds can conclude only that Plaintiff cannot state a prima facie

case of negligent misrepresentation, and Defendant is entitled to judgment as a matter of law on this claim.

**Promissory Estoppel**

{¶40} "The elements necessary to establish a claim for promissory estoppel are a (1) promise, (2) clear and unambiguous in its terms, (3) reliance that is reasonable and foreseeable, and (4) injury caused by such reliance." *Patel v. Univ. of Toledo*, 2017-Ohio-7132, ¶ 21 (10th Dist.).

{¶41} Plaintiff argues that Coach Buchholz promised Plaintiff that she would remain on the team with her scholarship intact if she recovered from surgery, and that she would not have undergone surgery and incurred medical and physical therapy bills without relying on that promise. (Complaint, ¶ 56-60). Defendant argues that Plaintiff's claim for promissory estoppel is not actionable because Plaintiff's claim is contractual in nature, and where there is a contract that governs the relationship of the parties, promissory estoppel will not lie. (Motion for Summary Judgment, p. 8); see also *Americana Inv. Co. v. Nat'l Contr. & Fixturing, LLC*, 2016-Ohio-7067, ¶ 13 (10th Dist.); *Valente v. Univ. of Dayton*, 438 Fed. Appx. 381, 386 (6th Cir. 2011). Plaintiff argues that her reliance on Coach Buchholz's statements before and after her surgery make her claim one for promissory estoppel, not a contractual claim, and that she is entitled to medical costs incurred for her surgery and physical therapy. (Plaintiff's Response in Opposition, p. 11). Plaintiff did not assert a breach of contract claim in her Complaint.

{¶42} The Tenth District Court of Appeals has previously recognized that "'when a student enrolls in a college or university, pays his or her tuition and fees, and attends such school, the resulting relationship may reasonably be construed as being contractual in nature.'" *Bleicher v. Univ. of Cincinnati College of Medicine*, 78 Ohio App.3d 302, 308 (10th Dist.1992), quoting *Behrend v. State*, 55 Ohio App.2d 135, 139 (10th Dist.1977). The terms of the contract between a university and its enrolled students are generally found in the university catalog and handbook. *Leiby v. Univ. of Akron*, 2006-Ohio-2831, ¶ 15 (10th Dist.), citing *Embrey v. Cent. State Univ.*, 1991 Ohio App. LEXIS 4886, *3 (10th Dist. 1991); *see also Smith v. The Ohio State Univ.*, 2024-Ohio-5887, ¶ 26 (10th Dist.). Additionally, the Tenth District Court of Appeals has held that "'[a] breach of contract claim

does not create a tort claim, and a tort claim based upon the same actions as those upon which a breach of contract claim is based exists only if the breaching party also breaches a duty owed separately from that duty created by the contract, that is, a duty owed even if no contract existed.'" (Internal citations omitted.) *Cameron v. Univ. of Toledo*, 2018-Ohio-979, FN 3 (10th Dist.).

{¶43} Here, Defendant provided UT's Student Athlete Handbook ("Handbook"). Mohler Deposition, Exhibit A. UT's Handbook provides guidelines on scholarships and grants-in-aid which include the rules for payments of medical bills. *Id.* at p. 33, 42. Specifically, the UT Handbook states:

> 1. **Athletic Insurance Coverage.** Insurance coverage for any injury sustained while participating in an intercollegiate sport at the University of Toledo is a **secondary accident policy**. Participation is defined as periods of official, organized athletic participation while under the general supervision of authorized University personnel or outside practice in preparation for intercollegiate participation. *Parental, guardian or personal insurance is the primary coverage* . . . **11. Pre-Existing Medical Condition(s)/Injury[:]** Any or all pre-existing injuries or medical conditions must be reported and documented to the University of Toledo Sports Medicine Team. This must be done prior to, or at the time of the initial physical examination. *The University of Toledo will not be financially responsible for any bills that are generated by a pre-existing condition.*

(Emphasis added.) *Id.* at 39-42. Plaintiff points to no evidence to rebut Defendant's assertion that any claims for medical expenses related to pre-existing injuries and subsequent surgeries to be cleared to play soccer for UT as a student-athlete would be governed by the Handbook.

{¶44} On January 13, 2022, Plaintiff signed the University of Toledo Student-Athlete Handbook Acknowledgement. Mohler Deposition, Exhibit C. The acknowledgement form states: "I will receive a University of Toledo Student-Athlete Handbook and acknowledge that I am fully accountable for the policies and expectations contained within . . . Your signature below attests that you have read and understand the student-athlete handbook acknowledgment." *Id.* Accordingly, the only reasonable

conclusion is that Plaintiff's claim is contractual in nature because payment of medical bills for student-athletes is addressed in the Handbook, and Plaintiff signed an acknowledgement stating that she read and understood the Handbook. Furthermore, reasonable minds can conclude only that the Handbook clearly states that parental insurance is the primary coverage and that UT is not liable for any medical bills related to pre-existing injuries; thus, any claim that UT was responsible for Plaintiff's medical bills is belied by the language of the Handbook.

{¶45} Even assuming Plaintiff's claim for promissory estoppel could survive independent of the Handbook, a claim for promissory estoppel requires that Plaintiff's reliance is reasonable. *Patel*, 2017-Ohio-7132, ¶ 21 (10th Dist.) Plaintiff argues that she relied on Coach Buchholz's statements that she would remain on the team with her scholarship intact if she recovered from surgery. (Complaint, ¶ 56.) The Court finds Plaintiff's argument unpersuasive. The only reasonable conclusion is that such reliance would no longer be reasonable after the meetings with coaching staff and the emails sent by Coach Buchholz informing Plaintiff of what she would have to do to remain on the team. *See* DeMarco Affidavit, Exhibits B and D.

{¶46} Construing the evidence most strongly in favor of Plaintiff, the only reasonable conclusion is that Plaintiff's relationship with UT was contractual in nature, and the language of the Handbook addresses Plaintiff's claim about medical bills. Therefore, Plaintiff's claim of promissory estoppel fails as a matter of law.

**Negligence**

{¶47} "[T]o establish actionable negligence, one seeking recovery must show the existence of a duty, the breach of the duty, and injury resulting proximately therefrom." *Strother v. Hutchinson*, 67 Ohio St.2d 282, 285 (1981).

{¶48} Like Plaintiff's theory of promissory estoppel, her negligence claim is based on allegations that UT allegedly owed Plaintiff a duty of care and/or breached UT policies. (Complaint, ¶ 62). Plaintiff alleges that the coaching staff had the duty to provide a safe team environment free from abuse, harassment, ridicule, embarrassment, and hostility, and were responsible for the enforcement all team policies, practices, procedures, acts, and conduct regarding the staff that affects the members of the team. *Id.* at ¶ 64. But,

Plaintiff does not state with particularity which policies were violated. *See* (Complaint), *generally.* Construing the evidence most strongly in Plaintiff's favor, the policies that Plaintiff asserts that UT's employees violated, and are the basis of her negligence claim, would be found in the student handbook. *Leiby*, 2006-Ohio-2831, ¶ 15 (10th Dist.), citing *Embrey*, 1991 Ohio App. LEXIS 4886, *3 (10th Dist. 1991); *see also Smith*, 2024-Ohio-5887, ¶ 26 (10th Dist.). It is undisputed that Plaintiff was a student at UT, and the relationship between Plaintiff and UT may reasonably be construed as being contractual in nature. See, *Bleicher and Behrend, supra.* Accordingly, insofar as such policies exist, the alleged policies would be governed by the Handbook and would be based on contract law, a claim not raised here.

{¶49} Moreover, "[i]ndefinite and aspirational language does not constitute an enforceable promise under Ohio law." *Ullmo ex rel. Ullmo v. Gilmour Academy*, 273 F.3d 671, 677 (6th Cir. 2001), citing *Rulli v. Fan Co.*, 1997-Ohio-380, 376. "[A] breach of contract claim will not arise from the failure to fulfill a statement of goals or ideals." *Allen v. Ethicon, Inc.*, 919 F.Supp. 1093, 1100 (S.D.Ohio 1996). "Absent mutual assent . . . a handbook becomes merely a unilateral statement of rules and policies which create no obligation and rights." *Clayton v. Cleveland Clinic Found.*, 2015-Ohio-1547, ¶ 11 (8th Dist.) citing *Tohline v. Cent. Trust Co., N.A.*, 48 Ohio App.3d 280, 282 (1st Dist.1988).

{¶50} Therefore, Plaintiff must identify a duty owed separately from that duty created by the Handbook, that is, a duty owed even if no contract existed. *See Cameron v. Univ. of Toledo*, 2018-Ohio-979, FN 3 (10th Dist.). Plaintiff argues that her negligence claims are based on the common-law duty of care and cites *Cameron*, 2018-Ohio-979, (10th Dist.) in support of her claim. (Plaintiff's Response in Opposition, p. 9). Plaintiff's reliance on *Cameron* is misplaced.

{¶51} In *Cameron*, the Tenth District Court of Appeals held that the duty element of negligence may be established by common-law, legislative enactment, or the particular circumstance of a case. *Id.* at ¶ 51; citing *Chambers v. St. Mary's School*, 1998-Ohio-184, p. 200. In *Cameron*, the court addressed the foreseeability of physical injuries occurring from a team building activity. *Id.* at ¶ 57-59. The Tenth District Court of Appeals held that the common-law duty of care is that degree of care which an ordinarily reasonable and prudent person exercises, or is accustomed to exercising, under the

same or similar circumstances. *Id.* at ¶ 56 (Internal citations omitted), citing *Mussivand v. David*, 45 Ohio St.3d 314, 318-319 (1989). The court found that given the facts present in *Cameron*, a common-law duty of care existed. *Cameron,* at ¶ 56.

{¶52} However, *Cameron*'s facts are distinguished from those present here. In *Cameron*, incoming freshmen to a university's football program participated in "freshmen Olympics" or "O-line challenges" which were supervised and directed by upperclassmen. *Id.* at ¶ 4. The freshmen offensive linemen conducted wheelbarrow races, a dance contest, bear and worm crawls, kicking or tackling a bag, and dunking a football above the goalpost crossbar. *Id.* In the course of such activities the plaintiff in *Cameron* jumped off the back of another teammate to dunk a football above the goalpost crossbar, but fell backwards, landing on his head or neck. *Id.* at ¶ 5. Cameron suffered brain damage as a result of the incident and could no longer play football resulting in a loss of his athletic scholarship. *Id.*

{¶53} The Tenth District Court of Appeals stated that

[t]he Court of Claims observed that "there is very little case law establishing a common law duty of care for coaches to their respective players." (Nov. 1, 2016 Decision at 18.) Cameron acknowledges the same. Our independent research revealed only one Ohio court that acknowledged a potential duty from such a relationship. In *Limerick v. Euclid Bd. of Educ.*, 69 Ohio App. 3d 807, 591 N.E.2d 1299 (8th Dist.1990), the Eighth District Court of Appeals observed that "there may be a general duty to supervise an athlete by giving adequate instruction, supplying proper equipment and supervising the particular contest." *Id.* at 810. . . . Under the particular circumstances of this case, on this question of law, we find that Walters and Wade owed Cameron a duty of care. We make this determination based on: (1) Walters' and Wade's contractual duties to protect and keep safe student athletes, (2) a common-law duty between a coach and student athletes under same or similar circumstances, and (3) the foreseeability of the harm suffered by Cameron.

*Id.* at ¶ 56-58.

{¶54} Plaintiff has pointed to no facts which would allow this Court to find that such a duty of care exists in this case.  Additionally, Plaintiff cites no authority, nor has this Court in its independent research discovered any such authority, for the proposition that a common-law duty of care is owed to student-athletes to prevent hostile or abusive comments made by athletic staff.

{¶55} Accordingly, construing the evidence most strongly in Plaintiff's favor, the only reasonable conclusion is that Plaintiff has failed to state a prima facie case of negligence as a matter of law.

## Conclusion

{¶56} Based on the foregoing, the Court finds that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Defendant has met its initial burden, pursuant to Civ.R. 56(C), by showing that there are no genuine issues of material fact.  However, Plaintiff has not met her reciprocal burden pursuant to Civ.R. 56(E), setting forth facts showing that there is a genuine issue for trial. Therefore, Defendant is entitled to judgment as a matter of law and Defendant's Motion for Summary Judgment is GRANTED.


LISA L. SADLER
Judge

[Cite as *Mohler v. Univ. of Toledo Athletic Dept.*, 2025-Ohio-518.]

| | |
|---|---|
| CAITLIN MOHLER | Case No. 2023-00630JD |
| Plaintiff | Judge Lisa L. Sadler<br>Magistrate Holly True Shaver |
| v. | <u>JUDGMENT ENTRY</u> |
| UNIVERSITY OF TOLEDO ATHLETIC DEPT | |
| Defendant | |

## IN THE COURT OF CLAIMS OF OHIO

{¶57} A non-oral hearing was conducted in this case upon Defendant's Motion for Summary Judgment.  For the reasons set forth in the decision filed concurrently herewith, Defendant's Motion for Summary Judgment is GRANTED and judgment is rendered in favor of Defendant.  All previously scheduled events are VACATED.  Plaintiff's January 17, 2025 Motion for Sanctions is DENIED as moot.  Court costs are assessed against Plaintiff.  The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

LISA L. SADLER
Judge

**Filed January 31, 2025**
**Sent to S.C. Reporter 2/18/25**